FILED

Jan 09 2018, 5:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Joel M. Schumm
Indiana University Robert H. McKinney
School of Law
Indianapolis, Indiana

Seth M. Smoker
Certified Legal Intern

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Robert Wilder, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | January 9, 2018 <br><br> Court of Appeals Case No. <br> 49A02-1706-CR-1420 <br><br> Appeal from the Marion <br> Superior Court <br><br> The Honorable Peggy R. Hart, <br> Magistrate <br><br> Trial Court Cause No. <br> 49G10-1609-CM-37937 |

**Bailey, Judge.**

# Case Summary

Robert Wilder ("Wilder") appeals his conviction, following a jury trial, of battery resulting in bodily injury, as a Class A misdemeanor,[1] and the term of his probation that prohibits him from possessing firearms. We affirm.

## Issues

Wilder raises the following two issues on appeal:

    I.    Whether the detective's testimony violated Indiana Rule of Evidence 704(b) and its admission was fundamental error.

    II.    Whether the condition of probation which prohibits him from possessing firearms during his probation period violates his right to bear arms, as protected by the Second Amendment to the United States Constitution and Article 1, § 32 of the Indiana Constitution.

## Facts and Procedural History

Wilder owns and operates a pierogi food truck. Food truck operators must operate out of a commissary or licensed board of health kitchen, and Wilder's commissary is on the south side of Indianapolis next to a bar and restaurant called The Tailgate, which is owned by Dennis Turpen ("Turpen").

At approximately 12:30 p.m. on August 6, 2016, Wilder went to his commissary to pick up frozen pierogi. Wilder's sixteen-year-old son was

---

[1] Ind. Code § 35-42-2-1(d)(1).

driving Wilder's vehicle, and Wilder's friend, William Greuesser ("Greuesser"), was a passenger in the back seat of the vehicle. Turpen had parked his truck in an alley behind his restaurant—where there are no parking spaces—in order to unload supplies from his truck and take them into his restaurant. Although Turpen's truck was not blocking the alley access, it was parked in such a manner that passing around his vehicle would be difficult. Wilder and Turpen had previously argued on several occasions about Turpen parking his car behind his restaurant. Believing his son, who was an inexperienced driver, would not be able to drive around Turpen's truck, Wilder called out to Turpen to move his truck. Turpen responded that it would only take him a few minutes to unload his truck, and pointed out that there was room enough to drive around his truck.

[5] Wilder became angry, yelled at Turpen, and then exited his vehicle and approached Turpen. An altercation ensued during which Wilder tackled Turpen and got Turpen face-down on the ground. Wilder knelt on top of Turpen and placed his forearm on the back of Turpen's neck. William Camp ("Camp"), who was across the street from Turpen and Wilder at a strip mall, did not see how the altercation began but he did witness Wilder holding Turpen down on the ground and banging Turpen's face onto the ground. Wilder then got up and went to Turpen's truck, where he began throwing things out of the truck and onto the ground. Wilder then got into the driver's seat of his own vehicle and sped away. Turpen sustained bleeding lacerations to his hands, arms, elbows, face and one knee. Wilder was not injured.

[6]     Both Turpen and Camp independently called 9-1-1 to report the incident. Indianapolis Metropolitan Police Department ("IMPD") Officer James Rusk ("Officer Rusk") responded to the 9-1-1 calls. When he arrived at The Tailgate, he saw that Turpen had blood on his nose, hands, elbows, and knees. Camp approached Officer Rusk and informed him that he had witnessed the altercation. Officer Rusk interviewed both Turpen and Camp at the scene.

[7]     IMPD Detective Kevin Duley ("Det. Duley") was assigned to investigate the incident further. As part of his investigation, Det. Duley interviewed Turpen five days after the incident and noticed that Turpen still had injuries on his nose and hands. Det. Duley also interviewed Camp regarding the incident. Det. Duley showed Camp an array of photographs, including one of Wilder, and Camp identified Wilder as the person whom he saw kneeling on top of Turpen and banging Turpen's head on the ground on August 6.

[8]     The State charged Wilder with battery resulting in bodily injury as a Class A misdemeanor. At his May 15, 2017, jury trial, Wilder contended that he had acted in self-defense because Turpen had swung at him first. As part of that defense, and beginning in his opening statement, Wilder attacked the quality of the police investigation and, specifically, the fact that police never spoke to Wilder, his son, or Greuesser before filing charges. In his opening statement, Wilder's attorney stated:

> The police investigation, which you will also learn today, uh, spoke to Turpen and Camp and that's it, never talked to my client. If they had they would have found out that there was

another eye witness and you will hear from him today too. …
And, if the police had investigated this case appropriately
you'd—they'd know that there was reasonable doubt.

Tr. Vol. II at 38-39. On cross-examination of Officer Rusk, Wilder's attorney elicited testimony that Officer Rusk never interviewed Wilder, his son, or Greuesser, and that Officer Rusk did not take photographs at the scene, collect DNA evidence, inspect Turpen's head for more injuries, call in an evidence technician, or check if there were surveillance videos at surrounding businesses that may have recorded the altercation.

[9] Following Officer Rusk's testimony, the State called Det. Duley to testify. He was the State's final witness in its case-in-chief, and the prosecutor asked the detective why he never spoke to Wilder during his investigation. Det. Duley replied:

> I felt that the evidence was sufficient that a battery had occurred, and uh[,] in speaking with Mr. Camp[,] his testimony to me corroborated what the victim said. And, in my opinion, Mr. Camp did not have a dog in the fight. He would have been better off to just walk away from the whole thing. Um, so it, it played a lot or it waived [sic] heavily for me that he was willing to stick around and give testimony that backed up what the victim said. That being said[,] I also felt like this was a case that maybe needed to see its day in court, as opposed to me taking a statement and—it be tried in the Prosecutor's Office so to speak. So[,] I submitted it to the Prosecutor for charging.

Tr. Vol. II at 117.

[10]     On May 15, the jury found Wilder guilty as charged. At the June 5 sentencing hearing, the State requested a no-contact order. Wilder did not object to the issuance of a no-contact order, but he asked the court to remove from its terms the prohibition on possessing a firearm, as this case did not involve the use of any firearm. The trial court imposed a 365-day sentence, all suspended to probation except for time served. The court imposed standard conditions of probation which included a condition that Wilder "not possess a firearm, destructive device, or other dangerous weapon or live in a residence where there are such items." App. Vol. II at 119. The court also imposed a no-contact order as a condition of probation, which included an order that Wilder "have no firearms, deadly weapons, or ammunition in his/her possession." *Id.* at 30. This appeal ensued.

# Discussion and Decision

## Indiana Rule of Evidence 704(b)

[11]     Wilder contends that Det. Duley's testimony that he turned Wilder's case over to the prosecutor without first interviewing Wilder because he "felt the evidence was sufficient that a battery had occurred," Tr. Vol. II at 117, violated Indiana Rule of Evidence 704(b) and should have been stricken. As our Supreme Court has recently noted,

> [w]e review evidentiary rulings for abuse of discretion resulting in prejudicial error. *Carpenter v. State*, 786 N.E.2d 696, 702 (Ind. 2003). A trial court abuses its discretion when its ruling is either clearly against the logic and effect of the facts and circumstances

before the court, or when the court misinterprets the law. *Id*. at 703. To determine whether an error prejudiced a defendant, "we assess the probable impact the evidence had upon the jury in light of all of the other evidence that was properly presented." *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014). If the conviction is properly supported by other independent evidence of guilt, the error is harmless. *Id*.

*Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015).

[12] Wilder failed to object at trial to the challenged testimony. A defendant must object to an alleged error to preserve the issue for appeal; issues raised for the first time on appeal are waived. *See, e.g.*, *Washington v. State*, 808 N.E.2d 617, 625 (Ind. 2004). The purpose of the contemporaneous objection requirement is to give the trial court a chance to avoid or correct the harmful error, thereby securing a fair and proper verdict. *Clark v. State*, 6 N.E.3d 992, 998 (Ind. Ct. App. 2014). "[A] trial court cannot be found to have erred as to an issue or argument that it never had an opportunity to consider." *Washington*, 808 N.E.2d at 625. Therefore, Wilder has waived the claim on review.

[13] However, Wilder maintains that the admission of the challenged testimony was fundamental error. The fundamental error exception to waiver is extremely narrow and applies only when the error constitutes a blatant denial of basic due process principles that makes it impossible to receive a fair trial. *See Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014). Thus, a matter rising to the level of fundamental error is a matter that the trial court had a *sua sponte* duty to correct. *Id*. "Fundamental error is meant to permit appellate courts a means to correct

the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Id*.

[14] Wilder asserts that Det. Duley's testimony that he "felt the evidence was sufficient that a battery had occurred" was the statement of a legal conclusion, in violation of Indiana Rule of Evidence 704(b). That rule precludes a witness from testifying "to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions."

[15] Even if Det. Duley's challenged testimony was an otherwise improper legal conclusion or ultimate opinion of Wilder's guilt,[2] it was nevertheless admissible because Wilder "opened the door" to such testimony when he raised the issue of the sufficiency of the police investigation.

> Opening the door refers to the principle that where one party introduces evidence of a particular fact, the opposing party is entitled to introduce evidence in explanation or rebuttal thereof, even though the rebuttal evidence otherwise would have been inadmissible. *See Clark v. State*, 915 N.E.2d 126, 130, 131 (Ind. 2009).

---

[2] *See, e.g.*, *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015) (holding a detective's testimony that a "transaction for cocaine" had occurred was a declaration of an ultimate opinion of the defendant's guilt, in violation of Rule 704(b)); *Bradford v. State*, 960 N.E.2d 871, 876 (Ind. Ct. App. 2012) (holding Department of Child Services caseworker's testimony that she "substantiated sexual abuse, meaning our office feels that there was enough evidence to conclude that sexual abuse occurred," was an improper opinion of the truth of the allegations, in violation of 704(b)).

*Sampson v. State*, 38 N.E.3d 985, 992 n.4 (Ind. 2015). Evidence which opens the door "must leave the trier of fact with a false or misleading impression of the facts related." *Cameron v. State*, 22 N.E.3d 588, 593 (Ind. Ct. App. 2014). When that happens, the State may introduce otherwise inadmissible evidence if it "is a fair response to evidence elicited by the defendant." *Id.*

[16] Here, Wilder "opened the door" for Det. Duley's testimony by attacking, in both his opening statement and his cross-examination of Officer Rusk, the sufficiency of the police investigation and, more specifically, the State's decision to bring charges against Wilder before police spoke with him and his witnesses. Wilder's attorney's opening remarks and cross-examination of Officer Rusk necessarily left the jury with the false impression that police must interview all witnesses before the State may file criminal charges. The State was entitled at that point to elicit testimony about why it brought charges against Wilder without first interviewing him, his son, or his friend who was in the car with him.[3] The trial court did not commit fundamental error by failing to, *sua sponte*, exclude that testimony.[4]

---

[3] For the same reason, the trial court did not err in allowing Det. Duley's testimony that appears to vouch for the credibility of Camp as a witness. Again, it was Wilder who first introduced the idea that the police had not "investigated this case appropriately." Tr. Vol. II at 38-39. Det. Duley's testimony that he thought Camp's non-biased account of the incident, together with the victim's statement, was sufficient to charge Wilder with battery was in direct response to Wilder's contention that the police failed to properly investigate the case when they did not interview Wilder or his witnesses. Thus, Wilder opened the door to Det. Dudley's "vouching testimony" and it was admissible. *See Sampson*, 38 N.E.3d at 992.

[4] Because we hold that Det. Duley's challenged testimony was admissible, we do not address the State's argument that any error was harmless.

# Probation Condition Prohibiting Possession of Firearms

## *Standard of Review*

[17] Wilder maintains that the condition of probation that prohibits him from possessing firearms during his probation period[5] violates his right to bear arms, as protected by the Second Amendment to the United States Constitution and Article 1, Section 32 of the Indiana Constitution.  Probation is a criminal sanction wherein a convicted defendant specifically agrees to accept conditions upon his behavior in lieu of imprisonment.  *See, e.g.*, *Bratcher v. State*, 999 N.E.2d 864, 873 (Ind. Ct. App. 2013), *trans. denied*.

> A trial court enjoys broad discretion when determining the appropriate conditions of probation.  *Freije v. State*, 709 N.E.2d 323, 324 (Ind. 1999).  This discretion is limited only by the principle that the conditions imposed must be reasonably related to the treatment of the defendant and the protection of public safety.  *Carswell v. State*, 721 N.E.2d 1255, 1258 (Ind. Ct .App. 1999).  Where, as here, the defendant challenges a probationary condition on the basis that it is unduly intrusive on a constitutional right, we will evaluate that claim by balancing the following factors:  (1) The purpose to be served by probation, (2) the extent to which constitutional rights enjoyed by law-abiding citizens should be enjoyed by probationers, and (3) the legitimate needs of law enforcement.

---

[5]  That condition is authorized by Indiana Code Section 35-38-2-2.3(a)(9).  Wilder does not attack the constitutionality of the statute on its face, only as applied to him.

*Smith v. State*, 779 N.E.2d 111, 117 (Ind. Ct. App. 2002), *trans. denied*; *see also Taylor v. State*, 820 N.E.2d 756, 761 (Ind. Ct. App. 2005) (quotation and citation omitted) ("Convicted individuals do not enjoy the same constitutional protections as law-abiding citizens. In the context of these constitutional freedoms, a state action is valid if reasonably related to legitimate penological interests."), *trans. denied*.

### Purpose to Be Served by Probation Condition

[18] The crime Wilder committed—battery resulting in bodily injury—was, by definition, a crime of violence. I.C. § 35-42-2-1(d)(1). The probation condition at issue here is meant to keep dangerous weapons out of the hands of those who have shown a propensity for violence, and that is a legitimate and important government purpose. *See, e.g.*, *United States v. Yancy*, 621 F.3d 681, 683-84 (7th Cir. 2010) (noting the important government purpose of a federal law prohibiting unlawful users of, or addicts to, controlled substances from possessing firearms was "to keep guns out of the hands of presumptively risky people"); *see also*, *Redington v. State*, 992 N.E.2d 823, 833 (Ind. Ct. App. 2013) (holding a state statute had the legitimate government purposes of permitting seizure of firearms from individuals found to meet the statutory definition of "dangerous"), *trans. denied*.

[19] The fact that Wilder's violent crime did not involve use of a firearm is not dispositive; it is the propensity of the probationer toward violence that is relevant to the need to prohibit possession of dangerous weapons such as firearms. *See, e.g.*, *United States v. Muehlhausen*, No. 1:12-CR-00102-TWP-

DML-51, 2013 WL 3043682, *4 (S.D. Ind. June 17, 2013) (holding the government had "a legitimate interest in keeping someone with [defendant]'s prior conduct history [of violent misdemeanors] from possessing firearms."); *cf. Carswell*, 721 N.E.2d at 1265 (holding that a condition of probation prohibiting a convicted child molester from using drugs or alcohol was reasonable, even in the absence of evidence that drugs or alcohol played any part in his crimes, since drug possession is illegal and "[t]he propensity of alcohol to impair judgment and reduce inhibition is known").

[20] The legitimate and important purpose of the probation condition prohibiting possession of firearms, as applied to Wilder, is to keep dangerous weapons out of the hands of a probationer whose underlying crime has shown he has a propensity toward violence resulting in harm to others.

### *Extent to which the Right to Bear Arms should be Afforded to Wilder*

I.    The Second Amendment

[21] The Second Amendment states in its entirety: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The United States Supreme Court has held that the "core protection" of the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742 (2010) (holding Second Amendment protections are applicable to the states). However, some categorical exclusions

on firearm possession may be constitutional. *See, e.g., United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (quoting *Heller*, 554 U.S. at 626-27) ("'[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.'"), *cert. denied*.

[22]  The federal courts use a two-pronged approach when analyzing a Second Amendment challenge to a law: (1) Does the challenged law impose a burden on conduct falling within the scope of the Second Amendment's guarantee? If not, the inquiry is complete. (2) If it does impose such a burden, does the law pass a heightened level of scrutiny? *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 703-04 (7th Cir. 2011), and cases cited therein. What level of scrutiny applies depends upon the severity of the burden on Second Amendment rights, although the scrutiny must, in any case, be stronger than rational basis review. *Id.* at 701, 708 (*citing Heller*, 554 U.S. at 628-29 & n.27).

> First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Id.* at 708.  This same analysis applies to categorical exclusions that are within the scope of the Second Amendment.  *See, e.g.*, *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010), *cert. denied*.

[23]  Here, the state statute authorizing a prohibition on possession of firearms as a probation condition, generally, seems to allow a categorical ban on firearm possession by any probationer, regardless of the nature of the underlying crime.[6] I.C. § 35-38-2-2.3(a)(9).  However, we do not decide whether such a categorical exclusion is constitutional, as Wilder challenges only the law as applied to him. As applied to Wilder, the law prohibits possession of firearms by a probationer *who committed a violent crime*—i.e., battery.

[24]  Since the probation condition burdens Wilder's right to bear arms, we must determine what level of scrutiny to apply to that burden.[7]  In making this determination, we note that the prohibition on possession of firearms is not an indefinite one; rather, it applies only during the term of Wilder's probation period, which was only 365 days.  Thus, the condition is a more "modest burden" on Wilder's right to bear arms.  *Ezell*, 651 F.3d at 708.  And it is not a

---

[6] Such a categorical exclusion may be permissible, as both the United States Supreme Court and the Seventh Circuit have stated that "only law-abiding persons" enjoy individualized Second Amendment rights. *Berron v. Illinois Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 847 (7th Cir. 2016) (citing *Heller*, 554 U.S. at 626-28), *cert. denied*; *see also Yancy*, 621 F.3d at 684-85 (citations and quotation omitted) ("Whatever the pedigree of the rule against even nonviolent felons possessing weapons (which was codified in federal law in 1938), most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm unvirtuous citizens.").

[7] Neither party to this appeal has addressed the level of scrutiny to be applied to Wilder's Second Amendment claim.

total ban on guns that applies to even law-abiding citizens. *See Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) ("[T]he state can prevail with less evidence when, as in *Skoien*, guns are forbidden to a class of persons who present a higher than average risk of misusing a gun."). Therefore, we apply an intermediate level of scrutiny. *Ezell*, 651 F.3d at 708. Intermediate scrutiny means "the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Williams*, 616 F.3d at 692.

[25] We have already noted that the government's objective of keeping guns out of the hands of probationers who have been convicted of violent crimes is an important one. So, too, is the government's goal of rehabilitating probationers. *E.g.*, *Carswell*, 721 N.E.2d at 1258. And we hold that application of the probation condition to Wilder is substantially related to those important goals. Wilder was convicted of a violent crime that caused injury to another, thus showing he has a propensity toward violence. Therefore, the State's goals of rehabilitating Wilder and preventing him, while on probation, from committing additional violence through the use of a deadly weapon is substantially furthered by the probation condition.

[26] The Seventh Circuit has reached similar conclusions in similar cases. In *United States v. Yancy*, for example, the court upheld a law making it a felony for anyone "who is an unlawful user of or addict to any controlled substance" to possess a firearm. 621 F.3d at 682. This law applied even to those who had never before been convicted of a felony, a crime involving a firearm, or, indeed,

any violent crime at all. The court held that, since "habitual drug users, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms," the law was substantially related to the government's important interest in "keep[ing] guns out of the hands of presumptively risky people." *Id*. at 683-84. And, importantly, the ban on firearm possession was not indefinite; the defendant "could regain his right to possess a firearm simply by ending his drug abuse." *Id*. at 687; *see also Skoien*, 614 F.3d at 642 ("The belief underpinning [the federal law prohibiting gun possession by those convicted of domestic violence] is that people who have been convicted of violence once—toward a spouse, child, or domestic partner, no less—are likely to use violence again.").

[27] The temporary curtailment of Wilder's right to bear arms is substantially related to the government's important goal of keeping dangerous weapons out of the hands of probationers who have shown a propensity for violence. Therefore, the challenged probation condition, as applied to Wilder, does not violate the Second Amendment.

## II. Article 1, Section 32

[28] Wilder contends that the challenged probation condition, as applied to him, also violates Article 1, Section 32 of the Indiana Constitution, which states: "The people shall have a right to bear arms, for the defense of themselves and the State." Claims under that provision are analyzed differently than Second Amendment claims. As we have most recently held, we apply both a rational

basis review and a material burden analysis to such claims. *Redington*, 992 N.E.2d at 832-35. That is, we first apply rational basis review to a restriction on firearms to determine if it is a valid exercise of "police power to promote health, safety, comfort, morals, and welfare of the public." *Id*. at 832 (citing *Price v. State*, 622 N.E.2d 954, 959 (Ind. 1993)). If the restriction passes rational basis review, we proceed to determine whether it "materially burdens" a "core value." *Id*. at 833.

### *Rational Basis Review*

[29] The firearm law at issue in *Redington* was Indiana Code Section 35-47-14-1, *et seq.*, which authorized the State to seize, pursuant to a warrant, firearms of a person who the State proved by clear and convincing evidence met the statutory definition of "dangerous." *Id*. at 830-31. We held that law was "rationally calculated to advance" the State's legitimate governmental purpose of prohibiting possession of firearms by those "dangerous" persons who "present a risk of personal injury to themselves or others." *Id*. at 833. This was so even though the defendant had never been convicted of a crime and claimed not to have a mental illness, where the State had nevertheless proven that he was dangerous as defined by statute. *Id*.

[30] Here, the challenged firearm restriction passes rational basis review for the same reasons it passed an intermediate level of scrutiny under the federal constitution. The State proved, beyond a reasonable doubt, that Wilder committed a violent crime. The probation condition prohibiting him from

possessing firearms is rationally calculated to advance the legitimate government interest in keeping firearms out of the hands of those who have shown a propensity for violence by committing a violent crime.

*Material Burden Analysis*

[31] As we noted in *Redington*, the core value implicated by firearms restrictions is the "right for law-abiding citizens to bear arms for self-defense." *Id*. (citing *Lacy v. State*, 903 N.E.2d 486, 490 (Ind. Ct. App. 2009), *trans. denied*).[8] However, our courts have recognized that the right to bear arms is not absolute. *Lacy*, 903 N.E.2d at 490 (citing *Kellogg v. City of Gary*, 562 N.E.2d 685, 694 (Ind. 1990)). "[S]tate action does not impose a material burden on [a core value] if either the 'magnitude of the impairment' is slight or the [exercise of the right] threatens to inflict 'particularized harm' analogous to tortious injury on readily identifiable private interests." *Redington*, 992 N.E.2d at 833 (quoting *State v. Econ. Freedom Fund,* 959 N.E.2d 794, 805 (Ind. 2011)). To determine the magnitude of the impairment, we look at whether the government action creates a "substantial obstacle" to the exercise of the right. *Id*. If not, then the law does not impose a material burden on the exercise of the right. *Id*. If so, we must then determine whether the defendant's exercise of that right would threaten to cause "particularized harm." *Id*.

---

[8] As in federal Second Amendment jurisprudence, the "law-abiding citizen" language in Indiana case law seems to remove probationers such as Wilder from any Article 1, Section 32 protections. Nevertheless, we proceed to the material burden analysis.

[32]     Here, as in *Redington*, the challenged restriction does not impose a substantial obstacle on Wilder's right to bear arms for self-defense because the restriction is temporary, lasting only while Wilder is serving his one-year probation. *See id*. at 834 (finding no substantial obstacle on the right to bear arms when the statute provided a mechanism for regaining the right to carry a firearm within 180 days).

[33]     Moreover, again as in *Redington*, even if we found the magnitude of the impairment on the right to bear arms was substantial, Wilder's challenge would still fail on the second component of the material burden test because his possession of firearms during probation would threaten to inflict "particularized harm" on others. *See id*. at 834-35 & n.4 (emphasis in original) (noting "we need only find that a *threat* analogous to tortious injury on readily available private interests exists regarding the 'particularized harm' component"). The State proved beyond a reasonable doubt that Wilder committed the violent crime of battery against Turpen, repeatedly banging Turpen's head on the ground and causing him injury. If Wilder possessed firearms, he would pose an even greater threat of violence. *See id.* (finding sufficient evidence of "particularized harm" where the state proved, by clear and convincing evidence, that the defendant was dangerous as defined by statute).

[34]     Because Indiana Code Section 35-38-2-2.3(a)(9), as applied to Wilder, has a rational basis and does not impose a material burden on Wilder's right to bear arms, it does not violate Article 1, Section 32 of the Indiana Constitution.

## *Legitimate Needs of Law Enforcement*

[35] Finally, as noted above, the challenged probation condition is meant to keep dangerous weapons out of the hands of those who—like Wilder—have shown a propensity for violence, and that is a legitimate and important government purpose. *See, e.g.*, *Yancy*, 621 F.3d at 683-84; *see also*, *Redington*, 992 N.E.2d at 833. Moreover, as the State points out, law enforcement has a legitimate need to protect probation officers from being shot by a violent probationer. Probation officers often engage in home visits and searches of probationers' homes in order to monitor and ensure compliance with the terms of probation. I.C. § 35-38-2-2.3(a). Indeed, "probation searches 'are necessary to the promotion of legitimate [state] interests.'" *State v. Vanderkolk*, 32 N.E.3d 775, 779 (Ind. 2015) (quoting *Samson v. California*, 547 U.S. 843, 849 (2006)); *see also, e.g.*, *Bonner v. State*, 776 N.E.2d 1244, 1249 (Ind. Ct. App. 2002) (discussing the ability to engage in warrantless probation searches as "an extremely valuable aid in rehabilitation" and the supervision and monitoring of probationers as a tool that facilitates the goals of genuine rehabilitation and protection of the public), *trans. denied*.

[36] Furthermore, the probation officer/probationer relationship is one that can become fraught with tension, as the probation officer has the power to regulate the probationer's behavior in ways that may be unwelcome and the power to seek a revocation of probation that could result in incarceration. Prohibiting a probationer from possessing firearms or residing in a home where firearms are present allows probation officers to carry out their critical supervisory

responsibilities in greater safety, which is a legitimate and weighty state interest. In addition, it provides protection for law enforcement officers serving arrest warrants for probation violations, which is also an important aspect of the supervision and monitoring necessary to a successful probation system. Decreasing the risk that officers will encounter violent, armed probationers is a significant and legitimate law enforcement need.

# Conclusion

[37] The trial court did not commit fundamental error by failing to, *sua sponte*, exclude Det. Duley's testimony under Rule of Evidence 704(b)—even if that testimony was an otherwise improper legal conclusion or ultimate opinion of Wilder's guilt— because Wilder "opened the door" to that testimony. *Sampson*, 38 N.E.3d at 992. And the trial court did not abuse its discretion when it imposed the probation condition prohibiting Wilder from possessing firearms during his one-year probationary period, since that provision, as applied to Wilder, does not violate the Second Amendment or Article 1, Section 32 of the Indiana Constitution.

[38] Affirmed.

Kirsch, J., and Pyle, J., concur.