

IN THE

# Court of Appeals of Indiana

Robert A. Neace,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Apr 21 2026, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

April 21, 2026

Court of Appeals Case No.
25A-CR-1615

Appeal from the Noble Circuit Court

The Honorable Kevin P. Wallace, Judge

Trial Court Cause No.
57C01-2403-F4-4

---

**Opinion by Judge Vaidik**
Judges Mathias and Pyle concur.

**Vaidik, Judge.**

## Case Summary

Robert A. Neace appeals his conviction for Level 4 felony child molesting, arguing that the trial court erred in allowing vouching testimony. The State argues that the vouching testimony was admissible because Neace opened the door to it during voir dire by asking prospective jurors if they would automatically believe a child and offering a general response to a prospective juror's spontaneous statement about children being coached to lie. But these remarks, without more, are not enough to open the door to otherwise inadmissible vouching testimony. And because the trial court's admission of the vouching testimony was not harmless error, we reverse Neace's conviction and remand for a new trial. In doing so, we caution both trial courts and the State against unwarranted use of vouching testimony in child-molesting cases.

## Facts and Procedural History

In 2022, Robert "Bob" Neace and his wife, Vicki Neace, ran a daycare in Kendallville. One of the children who attended the daycare was three-year-old E.H. On July 21, Vicki attended a training in Carmel, so Neace was the only one working at the daycare.

On July 20 or 21, E.H.'s father, Troy, found her in her bedroom putting diaper cream "in her privates and butt." Tr. Vol. 3 p. 73. This was "unusual" because E.H. was potty-trained, so she didn't use diaper cream. *Id.* The morning of July 22, E.H. didn't want to go to daycare. Her mother, Brittney, asked her why not,

and E.H. said, "Bob licked my butt and I didn't like it." *Id.* at 53. When Brittney asked E.H. to show her where Neace licked her, E.H. "pointed to her vagina." *Id.* at 60. E.H. said this happened in the toy room at the daycare. Brittney asked E.H. where Vicki was when this happened, and E.H. said she was at the doctor. Brittney took E.H. to the Fort Wayne Sexual Assault Treatment Center that day, while Troy collected the clothing and underwear he believed E.H. had worn to daycare the day before and provided them to police.

[4] E.H. underwent a medical forensic examination with Nurse Shawn Callahan, a certified sexual-assault nurse examiner. E.H. reported, "He licked my butt and his finger was in there, Bob. . . . It was in the toy room." Ex. 4 p. 4. She told Nurse Callahan "[i]t hurt" and pointed to her "internal" "female sex organ." Tr. Vol. 3 p. 110. During the examination, E.H. used the word "[b]utt" to refer to both her "buttocks" and her "female sex organ." *Id.* Nurse Callahan swabbed multiple parts of E.H.'s body, including her mouth, genital area, anus, and buttocks. She didn't identify any injury to E.H.'s vagina or anus.

[5] The same day, E.H. underwent a forensic interview, which was videotaped. E.H. told the interviewer, Adam Blakey, that "Bob licked her" "butt." *Id.* at 30. She said he "licks it all the time" and that it happened in the toy room but later added that he "licks it in the bathroom." Ex. 1 at 13:05, 16:56. Blakey showed E.H. an anatomical diagram of a girl, and E.H. used the word "body" to refer to the "female sex organ" and the word "butt" to refer to the "buttocks." Tr. Vol. 3 pp. 23, 30. Blakey asked E.H. to indicate on the diagram where Neace licked her, and she put a "mark up near the buttocks area." *Id.* at 26. Blakey

asked if Neace made E.H. lick him anywhere, and she said, "No. He licks my mouth too." Ex. 1 at 17:40. When Blakey asked if Neace did anything else other than lick her mouth and her "butt," E.H. said, "Yeah. . . . Licked me in the mouth and butt, right there," and pointed to her genital area. *Id.* at 24:15. E.H. told Blakey that Vicki was at the doctor when Neace licked her "butt."

[6] The clothing and underwear that Troy provided and the swabs taken during E.H.'s medical-forensic examination were tested for DNA. The profile from a sample from E.H.'s underwear contained DNA from two individuals. E.H. was "assumed as a contributor," there was "limited support for the inclusion of Troy" as a contributor, and Neace was "excluded as a contributor." Tr. Vol. 3 p. 186. No male DNA was detected on the oral, anal, or external genital swabs. The internal genital swabs contained "an insufficient quantity of male DNA for further analysis," which could be "from actual male DNA" or just "background noise." *Id.* at 187, 190; *see also* Ex. A p. 5 ("Male DNA quantitation at low levels can be unreliable and does not confirm the presence of male DNA.").

[7] The State charged Neace with Level 4 felony child molesting for "fondling or touching" E.H. Appellant's App. Vol. 2 p. 21. In preparation for trial, Neace took taped statements of several witnesses. Troy gave a taped statement in October 2024, during which he said that the incident with E.H. and the diaper cream happened on Wednesday, July 20, 2022.

[8] A few months before trial, the State moved to introduce certain hearsay evidence at trial—namely, evidence of E.H.'s initial disclosure to Brittney and

the video recording of E.H.'s forensic interview—under Indiana's Protected Person Statute (Indiana Code section 35-37-4-6). The trial court held a hearing on the State's motion in March 2025. E.H., then six, testified at the hearing. Defense counsel asked, "[H]as anyone ever licked your butt?" and E.H. said, "No." Tr. Vol. 2 p. 53. E.H. testified that "Bob" "touch[ed] [her] in a no touch area" while she was at daycare, and when asked if anyone else was there when this happened, she said "Vicki" and "other kids." *Id.* at 57. After the hearing, the court ruled that the State could introduce the hearsay evidence at trial.

[9] A jury trial was held in May 2025. The jury pool consisted of four groups, each with around 15 prospective jurors. During voir dire, defense counsel asked the prospective jurors about believing children and whether they thought that an allegation of child molesting means that something must've happened. Defense counsel asked each group of prospective jurors similar questions about how they would reconcile "wanting to believe a child on the one hand, but also protecting and ensuring the rights of somebody accused in a criminal case." *Id.* at 128 (first group); *see also id.* at 173 (second group) ("[H]ow do we deal with this desire . . . to believe a child versus . . . the constitutional obligation to protect the defendant's rights and ensure a fair trial[?]"), 208 (third group) ("[H]ow do you make that distinction between wanting to believe a child versus protecting the rights of a person that was accused[?]"), 237 (fourth group) ("How do you think you would navigate wanting to believe this child . . . versus your constitutional duty . . . to hold the State to their burden [of] proof beyond a reasonable doubt?"). In response to this question, a prospective juror in the

first group mentioned that "children can be manipulated" and "influenced . . . to say certain things." *Id.* at 128. After another prospective juror answered the question, defense counsel remarked, "[Prospective Juror] 1435, going back to what you said, that children can be coached to say, say this happened, like if it was an angry ex or something. So, this is their way of, you know, getting back with them through the child." *Id.* Counsel then moved on to another line of questioning. Defense counsel didn't raise the issue of coaching to any of the other groups of potential jurors.

[10] Once a jury had been selected, the State called forensic interviewer Blakey as its first witness. Blakey testified that he'd conducted over 500 forensic interviews in his career. After a sidebar, the State asked Blakey whether he'd ever encountered a child who had been coached. Neace objected and asked for a continuing objection. The trial court noted Neace's continuing objection but overruled it, and Blakey said yes. The following exchange then occurred:

> [THE STATE:] In that experience, were you able to observe any behaviors, mannerisms, anything at all that indicated to you that the children had been coached?
>
> THE WITNESS: Yes.
>
> Q Did you observe anything about E.H. that was similar to those interviews indicating that she had been coached?
>
> A No.

Tr. Vol. 3 p. 27. Blakey explained what words E.H. used to identify particular body parts but acknowledged that he "never asked her to explain what she meant by licking." *Id.* at 30.

[11]   E.H. testified next. She said that she "got a touch [she] didn't like . . . from a boy" who was "an adult." *Id.* at 41. The State gave E.H. anatomical diagrams of a girl and a boy and asked her to circle on the girl diagram where she was touched and circle on the boy diagram what body part the "boy" used to touch her. E.H. circled the genital area on the girl diagram, *see* Ex. 3a, which she identified as the "body," and she said that the "body" is "different than your butt," Tr. Vol. 3 p. 49. She circled the hand on the boy diagram and identified the "boy" who touched her as "bob." Ex. 3b. The State then played the video of E.H.'s forensic interview for the jury. When asked who else was at the daycare when the incident occurred, E.H. answered, "I forget," but she remembered saying at the March evidentiary hearing that "Vicki and the other kids were around," and she said that "sound[ed] right." Tr. Vol. 3 pp. 49, 50.

[12]   Troy testified that the incident with the diaper cream occurred on July 21, 2022, after he brought E.H. home from daycare. On cross-examination, after reviewing the transcript of his October 2024 taped statement, Troy acknowledged that he'd said during the taped statement that the diaper-cream incident happened on Wednesday, July 20, 2022, not July 21. When asked whether E.H. attended daycare that Wednesday, Troy said, "I'm not sure what days she went during that week." *Id.* at 80. Vicki testified that she was at a

training in Carmel on July 21 and didn't get back until after the daycare closed. She also said that E.H. didn't attend daycare on Wednesday, July 20, 2022.

[13] The State offered Nurse Callahan as an expert in forensic nursing with no objection from Neace. After the parties finished questioning Nurse Callahan, the court read two questions from the jury: "Are young children known to falsify findings verbally that contradict[] forensic findings or evidence, often, rarely," and "do forensic PRN's make recommendations to victim[s] and[/]or parents[?]" *Id.* at 124. Nurse Callahan answered, "[M]ost kids tell the truth when they come in and tell me, whoever asks, you can tell me if I'm not answering the way you want. Most kids that come in are telling the truth." *Id.* Neace objected on vouching grounds, which the court overruled. Nurse Callahan continued, "Even when kids are scared to death, they will tell the truth. Even if they've been threatened, they will tell the truth when they're there." *Id.* at 124-25. Neace made another vouching objection. Without explicitly ruling on the objection, the court instructed Nurse Callahan to answer the second juror question.

[14] Neace testified in his own defense and denied licking E.H. or touching her "in any way that was inappropriate." *Id.* at 211. He stated, "I don't know that E.H. is lying. . . . What I'm saying is it sounds like somebody convinced E.H. to say this." *Id.* at 222.

[15] The jury found Neace guilty of Level 4 felony child molesting, and the trial court sentenced him to six years in the Department of Correction.

[16] Neace now appeals.

# Discussion and Decision

[17] Neace argues that the trial court erred in admitting certain testimony from Blakey and Nurse Callahan. Generally, trial courts have broad discretion in ruling on the admissibility of evidence, and we review only for an abuse of that discretion. *Hoglund v. State*, 962 N.E.2d 1230, 1237 (Ind. 2012), *reh'g denied*. An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

## I. Neace did not open the door to vouching testimony

[18] Neace contends that Blakey and Nurse Callahan impermissibly vouched for E.H.'s credibility. Vouching testimony is prohibited by Indiana Evidence Rule 704(b), which provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Such testimony invades the province of the jury in determining what weight to give a witness's testimony. *Gutierrez v. State*, 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012). This is especially so in child sexual-abuse cases, which "often rely on the uncorroborated testimony of the victim, meaning the State's entire case hinges on the victim's credibility." *Henson v. State*, 237 N.E.3d 1160, 1167 (Ind. Ct. App. 2024), *trans. denied*.

[19] Here, Blakey testified that in the more than 500 forensic interviews he'd conducted, he'd observed signs that children had been coached, and he didn't

"observe anything about E.H. that was similar to those interviews indicating that she had been coached." In response to a juror question, Nurse Callahan testified that "[m]ost kids that come in" for an examination "are telling the truth" and that "[e]ven when kids are scared to death" or "they've been threatened, they will tell the truth when they're there." The State doesn't dispute that this testimony constitutes vouching; rather, it argues that the testimony was admissible because Neace opened the door to it. "Opening the door refers to the principle that where one party introduces evidence of a particular fact, the opposing party is entitled to introduce evidence in explanation or rebuttal thereof, even though the rebuttal evidence otherwise would have been inadmissible." *Sampson v. State*, 38 N.E.3d 985, 992 n.4 (Ind. 2015). Evidence that opens the door "must leave the trier of fact with a false or misleading impression of the facts related." *Wilder v. State*, 91 N.E.3d 1016, 1023 (Ind. Ct. App. 2018). "When that happens, the State may introduce otherwise inadmissible evidence if it is a fair response to evidence elicited by the defendant." *Id.* (quotation omitted).[1]

---

[1] Although statements during voir dire are not evidence, our court has indicated that a party may open the door to otherwise inadmissible evidence through voir dire. In *Sundling v. State*, 679 N.E.2d 988 (Ind. Ct. App. 1997), the State argued that Sundling opened the door to evidence of his other bad acts during voir dire. We rejected this argument not because the door cannot be opened during voir dire but because defense counsel's questions to prospective jurors "did not place the contention that the victims were fantasizing about their molestations in issue" and therefore could "not serve as an excuse for the admission of Sundling's extraneous bad acts or uncharged crimes." *Id.* at 993. While *Sundling* concerned opening the door to evidence of other bad acts or uncharged misconduct under Evidence Rule 404(b), the same principles apply to vouching testimony under Rule 704(b).

[20] The State claims that Neace opened the door to Blakey's and Nurse Callahan's vouching testimony during voir dire. It first points to defense counsel's questions about "wanting to believe a child versus protecting the rights of a person that was accused" and thinking "if this child said it's true, it must be true." Appellee's Br. p. 10. But simply raising the issue of whether to believe a child does not open the door to otherwise inadmissible vouching testimony. As noted above, many child sexual-abuse cases rely on the victim's uncorroborated testimony, and whether to believe the victim is almost always at issue in these cases. Asking prospective jurors if they would automatically believe a child doesn't leave them with a false or misleading impression of the facts or warrant an explanation or rebuttal from the State. *See Hayko v. State*, 211 N.E.3d 483, 487 n.2 (Ind. 2023) ("[D]uring voir dire, . . . the State's questions were properly aimed at discerning whether a prospective juror had any opinion, belief, or bias about children and their credibility, or whether they had any experiences that would impact their ability to evaluate a child's testimony concerning allegations of molestation."), *reh'g denied*. Defense counsel's questions during voir dire didn't open the door to Blakey's and Nurse Callahan's vouching testimony. *See Sundling*, 679 N.E.2d at 993 (rejecting State's claim that defendant opened the door during voir dire to evidence of other bad acts where defendant "merely pointed out that the testimony of young children could be manipulated by parents, police and therapists" but "did not place the contention that the victims were fantasizing about their molestations in issue").

[21] The State also argues that Neace opened the door when he "injected the possibility of children being dishonest and being coached" while questioning prospective jurors. Appellee's Br. p. 10. It is true that a court may permit "testimony about the signs of coaching and whether a child exhibited such signs or has or has not been coached, provided the defendant has opened the door to such testimony." *Sampson*, 38 N.E.3d at 992. But we disagree with the State that Neace "injected" the issue of coaching. Although defense counsel referenced coaching to the first group of prospective jurors, he did so only after a prospective juror stated that "children can be manipulated" and "influenced . . . to say certain things." Defense counsel responded, "[Prospective Juror] 1435, going back to what you said, that children can be coached to say, say this happened . . . ." Counsel then moved on to another line of questioning and didn't raise the issue of coaching to any other group of prospective jurors. This isolated remark by the defense—which most of the jurors never even heard—didn't leave the first group of prospective jurors with a false or misleading impression of the facts.

[22] Importantly, Neace didn't claim in his opening statement that E.H. had been coached or ask any questions about coaching when cross-examining witnesses during the State's case-in-chief. *See Sundling*, 679 N.E.2d at 993 (after finding that the defendant didn't raise during voir dire the issue of "[w]hether the children fantasized their molestation," noting that he also "never presented any specific factual claim at trial that [the children] 'fantasized' their sexual encounters so as to allow the prosecution to rebut with evidence of prior

misconduct"). Although Neace testified during his own case that "it sounds like somebody convinced E.H. to say this," Blakey and Nurse Callahan testified well before Neace, so their vouching testimony couldn't have been in response to Neace's statement. And while a party may introduce otherwise inadmissible evidence when the other party opens the door to it, neither party introduced Nurse Callahan's vouching testimony—it came in response to a juror question. If the State truly believed that Neace had opened the door to this testimony during voir dire, it presumably would have asked Nurse Callahan questions to elicit such testimony, such as whether E.H. exhibited signs of coaching during her examination. Defense counsel's comment in response to a prospective juror's statement about coaching, without more, didn't open the door to Blakey's and Nurse Callahan's vouching testimony. *See Sampson*, 38 N.E.3d at 992 (finding that testimony about whether child exhibited signs of coaching was improper where it "was neither in response to defense questioning, nor to rebut an express claim that [the child] had been coached"). The trial court therefore abused its discretion in admitting this testimony.

## II. The trial court's error in admitting the vouching testimony was not harmless

[23] Neace contends that the error in the admission of Blakey's and Nurse Callahan's testimony wasn't harmless, and thus reversal is required. An error is harmless "where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." *Hayko*, 211 N.E.3d at 492 (quoting Ind. Appellate Rule 66(A)). Under the "probable

impact" test, the party seeking relief bears the burden of demonstrating how, in light of all the evidence, the error's probable impact undermines confidence in the outcome of the proceeding below. *Id.* The improper admission of evidence is harmless if there is substantial independent evidence of guilt supporting a conviction such that we can say there is no substantial likelihood that the questioned evidence contributed to the conviction. *Hamilton v. State*, 43 N.E.3d 628, 634 (Ind. Ct. App. 2015), *aff'd on reh'g*, 49 N.E.3d 554, *trans. denied*. On the other hand, "[r]eversal may be compelled if the record as a whole discloses that the erroneously admitted evidence was likely to have had a prejudicial impact on the fact-finder, thereby contributing to the judgment." *Id.*

[24] There is not substantial independent evidence of guilt to support Neace's conviction. Neace's DNA was excluded from the underwear that Troy believed E.H. had worn on July 21. Nurse Callahan swabbed multiple parts of E.H.'s body during her medical-forensic examination, but no male DNA was detected on the oral, anal, or external genital swabs. And Nurse Callahan didn't identify any injury to E.H.'s vagina or anus during the examination. Additionally, the jury heard Neace testify in his own defense that he didn't lick E.H. or touch her "in any way that was inappropriate."

[25] The State claims that Vicki's absence from the daycare on July 21, 2022, and E.H. applying diaper cream "in her privates and butt" "corroborated E.H.'s story." Appellee's Br. p. 11. Although E.H. initially said that Vicki was at the doctor during the molestation, and Vicki wasn't at the daycare on July 21, E.H. later testified that Vicki was there during the incident. Similarly, Troy gave

conflicting testimony as to whether the diaper-cream incident occurred on July 20 or July 21, 2022. Vicki testified that E.H. didn't attend daycare on July 20, so if the diaper-cream incident was that day, it would've happened before the molestation. Given the confusion about whether Vicki was at the daycare when the molestation occurred and when E.H. applied the diaper cream, any support this evidence lends to Neace's guilt is minimal.

[26] Without additional evidence of guilt, the State's case hinged on E.H.'s credibility. Although E.H.'s disclosures to Brittney, Nurse Callahan, and Blakey were similar, they varied in several respects. E.H. told all three of them that "Bob licked [her] butt" in the toy room and pointed to her female sex organ. But in her examination with Nurse Callahan, E.H. added that Neace's "finger was in there." And she also told Blakey that Neace "licks [her butt] in the bathroom" and "licks [her] mouth too." In addition to these discrepancies, E.H.'s trial testimony differed greatly from her disclosures. She testified that a "boy" who was "an adult" "touch[ed]" her genital area but made no mention of licking. When asked to identify on the male anatomical diagram what body part the "boy" used to touch her, she circled only the hand.

[27] Blakey's testimony that E.H. didn't show signs of being coached and Nurse Callahan's testimony that children tell the truth during sexual-assault examinations were effectively statements that E.H. was telling the truth. *See Hoglund*, 962 N.E.2d at 1238 ("[A]lthough none of the expert witnesses' responses took the direct form of 'I believe the child's story,' or 'In my opinion the child is telling the truth,' . . . their responses were comments on the child

witness' truthfulness."). Given that E.H.'s account of the molestation changed at trial, and the lack of substantial independent evidence of guilt, these statements likely had a prejudicial impact on the jury and contributed to the guilty verdict. Thus, the trial court's error in admitting these statements was not harmless. *See Hamilton*, 43 N.E.3d at 634 ("The only value of [the forensic interviewer's] testimony was to improperly bolster the credibility of [the victims]. . . . [I]t is extremely difficult to imagine a scenario in which such testimony . . . is harmless in a case such as this where a conviction depends entirely upon assessing the credibility of the alleged victim."). We therefore reverse Neace's conviction and remand for a new trial.[2]

[28] Reversed and remanded.

Mathias, J., and Pyle, J., concur.

ATTORNEY FOR APPELLANT

Josiah Swinney
Indianapolis, Indiana

---

[2] Neace also argues that the trial court erred in denying his motion to remove a juror who revealed during trial that he knew E.H.'s father. But because we reverse and remand on evidentiary grounds, we need not address this issue.

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

Tyler Banks
Section Chief, Capital and Habeas Litigation
Indianapolis, Indiana