In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1138

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MATTHEW YANCEY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08-cr-00103—**Barbara B. Crabb**, *Judge.*

ARGUED AUGUST 4, 2009—DECIDED SEPTEMBER 3, 2010

Before FLAUM, KANNE, and WOOD, *Circuit Judges.*

PER CURIAM.  Matthew Yancey pleaded guilty to pos-
sessing a firearm as an unlawful user of marijuana
but reserved the right to argue on appeal that the offense
of conviction, 18 U.S.C. § 922(g)(3), violates the Second
Amendment as interpreted in *District of Columbia v.
Heller,* 128 S. Ct. 2783 (2008). We conclude that the
statute is constitutional and affirm Yancey's conviction.

Police officers executed an arrest warrant for Yancey
in June 2008. Yancey, who was 18 at the time, was

carrying a loaded pistol and 0.7 grams of marijuana. He confessed that he had been smoking marijuana daily since age 16. Arrests for possession of marijuana in 2006 and again in 2008 corroborate this admission.

A grand jury charged Yancey with violating 18 U.S.C. § 922(g)(3), which makes it a felony for a person "who is an unlawful user of or addicted to any controlled substance" to possess a gun. An "unlawful user" is someone, like Yancey, who regularly ingests controlled substances in a manner except as prescribed by a physician. *See* 27 C.F.R. § 478.11; *United States v. Burchard*, 580 F.3d 341, 352 (6th Cir. 2009); *United States v. Patterson*, 431 F.3d 832, 839 (5th Cir. 2005). Yancey conceded the violation but moved to dismiss the indictment on the ground that the statute violates the Second Amendment. Yancey cited *Heller,* which holds that the Second Amendment preserves an individual's right to keep handguns for self-defense. 128 S. Ct. at 2821-22; *United States v. Jackson*, 555 F.3d 635, 636 (7th Cir.), *cert. denied*, 130 S. Ct. 147 (2009). Although Yancey was carrying his gun outside his home, he argued that *Heller* shields him from prosecution because he is not a felon and the weapon is commonplace. And, Yancey continued, the government would need, but could not articulate, a compelling interest to justify dispossessing habitual drug users of their guns. The district court denied the motion, concluding that nothing in *Heller* prevents the government from criminalizing firearm possession by someone who habitually uses drugs illegally. Yancey then entered a conditional guilty plea and was sentenced to 21 months' imprisonment and 3 years' supervised release.

Yancey's sole argument on appeal is that the district court should have dismissed the indictment on the ground that § 922(g)(3) violates the Second Amendment. We review the district court's legal conclusion de novo. *See United States v. Greve,* 490 F.3d 566, 570 (7th Cir. 2007). This court has not yet analyzed § 922(g)(3) after *Heller,* and no other circuit has published an opinion deciding its constitutionality. Our full court, however, did recently evaluate whether the Constitution permits Congress to bar those convicted of domestic violence crimes from possessing firearms, *see* 18 U.S.C. § 922(g)(9), and we concluded that it does. *See United States v. Skoien*, No. 08-3770, 2010 WL 2735747, at *3 (7th Cir. July 13, 2010) (en banc).

In considering the constitutionality of § 922(g)(3), we begin with the Supreme Court's recent decisions in *Heller* and *McDonald v. City of Chicago*, 130 S. Ct 3020 (2010). Although the Court concluded that the Second Amendment preserves "the individual right to possess and carry weapons in case of confrontation," *Heller*, 128 S. Ct. at 2797, that right is not unlimited. The Court has since admonished that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" *McDonald*, 130 S. Ct. at 3047 (quoting *Heller*, 128 S. Ct. at 2816-17). *Heller*'s footnote 26 underscores that at least these two categorical bans are "presumptively lawful." *Heller*, 128 S. Ct. at 2817 n.26. The Court declined to further elaborate on the full extent of the Second Amendment's reach, noting that "there will be time enough to expound upon the historical justifications for the excep-

tions we have mentioned if and when those exceptions come before us." *Id.* at 2821. With this case, we move beyond those exceptions to a different, but equally defensible, categorical ban.

We have already concluded, based on our understanding of *Heller* and *McDonald,* that some categorical firearms bans are permissible; Congress is not limited to case-by-case exclusions. *Skoien*, 2010 WL 2735747, at *3. And we have already considered and rejected the notion that only exclusions in existence at the time of the Second Amendment's ratification are permitted. *Id*. It was not until 1968 that Congress barred the mentally ill from possessing guns, and it was in that same legislation that habitual drug abusers were prohibited from having guns. *See* Gun Control Act of 1968, Pub. L. 90-618, § 102, 82 Stat. 1213, 1220.

But though Congress may exclude certain categories of persons from firearm possession, the exclusion must be more than merely "rational," *Heller*, 128 S. Ct. at 2817 n.27, and must withstand "some form of strong showing," *Skoien*, 2010 WL 2735747, at *3. (We have thus far, like the Supreme Court, declined to wade into the " 'levels of scrutiny' quagmire," *id.*; *see also Heller*, 128 S. Ct. at 2817 (striking down D.C.'s law "[u]nder any level of scrutiny")). In both *Skoien* and *United States v. Williams*, we evaluated whether the government had made a strong showing that the challenged subsection of § 922(g) was substantially related to an important governmental objective. *See United States v. Williams*, No. 09-3174, 2010 WL 3035483, at *6 (7th Cir. Aug. 5, 2010); *Skoien*, 2010

WL 2735747, at *3. We apply that same analytical frame-
work here, and again reserve the question whether a
different kind of firearm regulation might require a
different approach. *See Williams*, 2010 WL 3035483, at *6.

Congress enacted the exclusions in § 922(g) to keep
guns out of the hands of presumptively risky people. *See
Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6
(1983); *see also* S. REP. NO. 90-1501, at 22 (1968) ("The
ready availability, that is, the ease with which any
person can anonymously acquire firearms (including
criminals, juveniles without the consent of their parents
or guardians, narcotic addicts, mental defectives, armed
groups who would supplant duly constituted public
authorities, and others whose possession of firearms is
similarly contrary to the public interest) is a matter of
serious national concern."). The broad objective of
§ 922(g)—suppressing armed violence—is without doubt
an important one, *see Williams*, 2010 WL 3035483, at *6,
*Skoien*, 2010 WL 2735747, at *3, and the government
contends that keeping guns away from habitual drug
abusers is substantially related to that goal. As the gov-
ernment notes, many states have restricted the right of
habitual drug abusers or alcoholics to possess or carry
firearms. *See* ALA. CODE § 13A-11-72(b); ARK. CODE ANN.
§ 5-73-309(7), (8); CAL. PENAL CODE § 12021(a)(1); COLO.
REV. STAT. § 18-12-203(e), (f); DEL. CODE ANN. tit. 11,
§ 1448(a)(3); D.C. CODE § 22-4503(a)(4); FLA. STAT.
§ 790.25(2)(b)(1); GA. CODE ANN. § 16-11-129(2)(f), (*i*), (j);
HAW. REV. STAT. § 134-7(c)(1); IDAHO CODE ANN. § 18-
3302(1)(e); 720 ILCS 5/24-3.1(a)(3); IND. CODE § 35-47-1-7(5);
KAN. STAT. ANN. § 21-4204(a)(1); KY. REV. STAT. ANN.

§ 237.110(4)(d), (e); MD. CODE ANN., Public Safety, 5-133(b)(4), (5); MASS. GEN. LAWS ch. 140, § 129B(1)(iv); MINN. STAT. § 624.713(10)(iii); MO. REV. STAT. § 571.070(1)(1); NEV. REV. STAT. § 202.360(1)(c); N.H. REV. STAT. ANN. § 159:3(b)(3); N.J. STAT. ANN. § 2C:58-3(c)(2); N.C. GEN. STAT. § 14-404(c)(3); OHIO REV. CODE ANN. § 2923.13(A)(4); R.I. GEN. LAWS § 11-47-6; S.C. CODE ANN. § 16-23-30(A)(1); S.D. CODIFIED LAWS § 23-7-7.1(3); W. VA. CODE § 61-7-7(2), (3). These statutes demonstrate that Congress was not alone in concluding that habitual drug abusers are unfit to possess firearms. The state prohibitions, moreover, are merely the latest incarnation of the states' unbroken history of regulating the possession and use of firearms dating back to the time of the amendment's ratification. *See generally* Saul Cornell & Nathan DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 502 (2004). That some of these restrictions are entrenched supports their constitutionality: "This court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution, when the founders of our government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given its provisions." *Myers v. United States*, 272 U.S. 52, 175 (1926).

Keeping guns away from habitual drug abusers is analogous to disarming felons. We have already concluded that barring felons from firearm possession is constitutional. *See Williams*, 2010 WL 3035483, at *7. Though scholars continue to debate the evidence of historical precedent for prohibiting criminals from

carrying arms, *compare Skoien*, 2010 WL 2735747, at *2; Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1983) ("Felons simply did not fall within the benefits of the common law right to possess arms."), *with Skoien*, 2010 WL 2735747, at *11 (Sykes, J., dissenting); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 728-35 (2009), it cannot be disputed that states were regulating firearms as early as the nineteenth century. *See State v. Hogan*, 58 N.E. 572, 218-19 (Ohio 1900) (opining that prohibition on tramps bearing arms was constitutional); *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding law prohibiting intoxicated persons from carrying firearms); *see also Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897) (noting that Bill of Rights codified liberties inherited from "our English ancestors" with well-recognized exceptions). Whatever the pedigree of the rule against even nonviolent felons possessing weapons (which was codified in federal law in 1938), most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm "unvirtuous citizens." *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (citing Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995), and Don B. Kates, Jr., *The Second Amendment: A Dialogue*, LAW & CONTEMP. PROBS., Winter 1986, at 143, 146 (1986)), *petition for cert. filed* (July 13, 2010) (No. 10-5423); THOMAS M. COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS 29 (Boston, Little Brown & Co. 1868) (explaining that con-

stitutions protect rights for "the People" excluding, among others, "the idiot, the lunatic, and the felon"); *see also Skoien*, 2010 WL 2735747, at *2. As we've explained in a different context, most felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use. *United States v. Lane*, 252 F.3d 905, 906 (7th Cir. 2001). Thus, while felon-in-possession laws could be criticized as "wildly overinclusive" for encompassing nonviolent offenders, every state court in the modern era to consider the propriety of disarming felons under analogous state constitutional provisions has concluded that step to be permissible. Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 721 (2007). And that reasoning applies with equal force to Congress's extension of the firearms ban to another category of habitual criminals with § 922(g)(3).

Moreover, habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms. In *Heller* and *McDonald*, the Court endorsed the exclusion of the mentally ill from firearm possession as presumptively valid. *McDonald*, 130 S. Ct. at 3049; *Heller*, 128 S. Ct. at 2816-17. Federal law did not prohibit firearm possession by those adjudicated mentally ill or committed to a mental institution until 1968, *see Skoien*, 2010 WL 2735747, at *2 (citing Pub. L. 90-618, 82 Stat. 1213, 1220). But the absence of historical statutory prohibitions on firearm possession may have been the consequence of the fact that "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics'

who were 'dangerous to be permitted to go abroad.'"
Carlton F.W. Larson, *Four Exceptions in Search of a Theory:*
District of Columbia v. Heller *and Judicial Ipse Dixit*, 60
HASTINGS L.J. 1371, 1377 (2009) (citing HENRY CARE,
ENGLISH LIBERTIES, OR THE FREE-born SUBJECT'S INHERI-
TANCE 329 (6th ed. 1774)); *accord* Don B. Kates & Clayton E.
Cramer, *Second Amendment Limitations and Criminological
Considerations*, 60 HASTINGS L.J. 1339, 1361 n.136; *see also
United States v. Emerson*, 270 F.3d 203, 226 n.21 (5th
Cir. 2001) (noting that "lunatics" and "those of unsound
mind" were historically prohibited from firearm posses-
sion). Extending the ban to those who regularly abuse
drugs makes particular sense because the Court has
noted the similarity between the two groups. A few
years before Congress barred the mentally ill and
habitual drug abusers from possessing guns, the Court
noted that drug addiction is an illness not unlike
other mental illnesses, and that it could in some cases
be contracted innocently or inadvertently. *See Robinson v.
California*, 370 U.S. 660, 667 (1962); *see also Linder v.
United States*, 268 U.S. 5, 18 (1925). In *Robinson*, the
Court struck down a law criminalizing drug addic-
tion, which the Court reasoned was analogous to impris-
oning someone for having a common cold. 370 U.S. at
667. But even while recognizing that addiction is an
illness, the Court nevertheless recognized that an addict's
*behavior* can be regulated. Just a few months before Con-
gress excluded both the mentally ill and drug users
from firearm possession, the Court clarified that the
Constitution did not forbid criminalizing the public acts
of a habitual user. Rather than criminalizing status, the
Court said, the state "has imposed upon appellant a

criminal sanction for public behavior which may create substantial health and safety hazards, both for appellant and for members of the general public." *Powell v. Texas*, 392 U.S. 514, 532 (1968); *see also United States v. Jester*, 139 F.3d 1168, 1170 (7th Cir. 1998) (citing *Powell* to support constitutionality of felon-in-possession laws). So, too, with keeping firearms out of the hands of an habitual drug abuser, who has "lost the power of self-control with reference to the use of controlled substance," 27 C.F.R. § 478.11, and whose possession of a firearm likewise poses substantial health and safety hazards. As the House manager stated during debate on the legislation, "No one can dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses, from buying, owning, or possessing firearms." 114 CONG. REC. 21784 (1968).

Ample academic research confirms the connection between drug use and violent crime. For example, nearly four times as many adults arrested for serious crimes had used an illegal drug in the previous year than had not. *See* OFFICE OF APPLIED STUDIES, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, ILLICIT DRUG USE AMONG PERSONS ARRESTED FOR SERIOUS CRIMES, NSDUH REPORT (2005), *available at* http://www.oas.samhsa.gov/2k5/arrests/arrests.pdf. Other academic research demonstrates a strong connection between drug use and violence. *See, e.g.,* Carrie B. Oser, et al., *The Drugs—Violence Nexus Among Rural Felony Probationers*, 24 J. INTERPERSONAL VIOLENCE 1285, 1298-99 (2009) (noting connection between illegal stimulant use and violence as well as economically motivated violence by

drug addicts); BUREAU OF JUSTICE STATISTICS, U.S.
DEP'T OF JUSTICE, DRUG USE AND DEPENDENCE, STATE
AND FEDERAL PRISONERS, 2004, at 7 (2007), *available at*
http://bjs.ojp.usdoj.gov/content/pub/pdf/dudsfp04.pdf
(noting that nearly half of violent offenders in state
prisons were dependent on drugs); H. Virginia McCoy,
et al., *Perpetrators, Victims, and Observers of Violence: Chronic
and Non-Chronic Drug Users*, 16 J. INTERPERSONAL VIOLENCE
890, 906 (2001) (documenting notable connection be-
tween chronic drug abusers and violence); Roger H.
Peters, et al., *Prevalence of DSM-IV Substance Abuse and
Dependence Disorders Among Prison Inmates*, 24 AM. J. DRUG
ALCOHOL ABUSE 573, 583 (1998) (reporting that three-
quarters of state inmates have a history of substance
abuse); Lana Harrison & Joseph Gfroerer, *The Intersection
of Drug Use and Criminal Behavior: Results from the
National Household Survey on Drug Abuse*, 38 CRIME &
DELINQUENCY 422, 438 (1992) (reporting that drug
abusers are more likely to engage in both property and
violent crimes). These studies amply demonstrate the
connection between chronic drug abuse and violent
crime, and illuminate the nexus between Congress's
attempt to keep firearms away from habitual drug
abusers and its goal of reducing violent crime.

Finally, unlike those who have been convicted of a
felony or committed to a mental institution and so face
a lifetime ban, an unlawful drug user like Yancey could
regain his right to possess a firearm simply by ending
his drug abuse. In that sense, the restriction in § 922(g)(3)
is far less onerous than those affecting felons and the
mentally ill. We have observed before that there is no

constitutional problem with separating guns and drugs. *See Jackson*, 555 F.3d at 636. The prohibition in § 922(g)(3) bars only those persons who are *current* drug users from possessing a firearm, and "[i]t is obvious that the tenses used throughout Title IV [including § 922(g)] were chosen with care." *Scarborough v. United States*, 431 U.S. 563, 570 (1977); *see also United States v. Jackson*, 480 F.3d 1014, 1021 (9th Cir. 2007). Every circuit to have considered the question has demanded that the habitual abuse be contemporaneous with the gun possession. *See Patterson*, 431 F.3d at 839; *United States v. Augustin*, 376 F.3d 135, 139 (3d Cir. 2004); *United States v. Turnbull*, 349 F.3d 558, 561 (8th Cir. 2003), *vacated on other grounds*, 543 U.S. 1099 (2005) (finding *Booker* error), *reinstated*, 414 F.3d 942 (8th Cir. 2005); *United States v. Jackson*, 280 F.3d 403, 406 (4th Cir. 2002); *United States v. Purdy*, 264 F.3d 809, 812-13 (9th Cir. 2001). Thus the gun ban extends only so long as Yancey abuses drugs. In that way, Yancey himself controls his right to possess a gun; the Second Amendment, however, does not require Congress to allow him to simultaneously choose both gun possession and drug abuse.

In sum, we find that Congress acted within constitutional bounds by prohibiting illegal drug users from firearm possession because it is substantially related to the important governmental interest in preventing violent crime.

AFFIRMED.