*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

EDWARD AARON HUGHES,

Defendant-Appellant.

FOR PUBLICATION
August 13, 2025
9:09 AM

No. 367172
Wayne Circuit Court
LC No. 20-004905-01-FH

Before: LETICA, P.J., and MURRAY and PATEL, JJ.

MURRAY, J.

Defendant appeals as of right his bench trial convictions for one count of being a felon in possession of a firearm (felon-in-possession), MCL 750.224f, and one count of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[1] Defendant was sentenced to two years' probation for the felon-in-possession conviction, and two years' incarceration for the felony-firearm conviction, to be served concurrently. We remand.

## I. FACTUAL BACKGROUND

This case arises out of an alleged domestic dispute involving defendant and his girlfriend at the home of defendant's mother, which resulted in law enforcement searching the premises and recovering two firearms, in addition to a BB gun, in the basement. In early May of 2020, officers were dispatched to a home in Redford after emergency services received a call concerning a domestic altercation involving an armed man in the home. Redford Township police officer Ashley Bankstahl, arriving on the premises approximately five minutes after the emergency contact, first inspected the perimeter of the house, during which she saw a man in the "back room,"

---

[1] Defendant was charged with two counts of felon-in-possession, and two counts of felony-firearm, as two distinct firearms, a shotgun and a pistol, were recovered from his mother's residence, in addition to a BB gun. However, defendant was acquitted of one count of felon-in-possession, and one count of felony-firearm, regarding his alleged constructive possession of the shotgun. His convictions were based on his constructive possession of the pistol.

-1-

who was subsequently identified as defendant. After asking him to step outside of the house, law enforcement detained defendant in a police vehicle. Officers then turned to whether anyone else was in the house, and after defendant's mother indicated that defendant's grandmother was in the house and that police could enter, they located her in a first-floor bedroom. Once she was secured, officers searched the basement, where they recovered a pistol, a shotgun, and a BB gun that resembled a rifle. According to Officer Bankstahl, the handgun was in plain view, as she viewed it while walking up the stairs and saw it in "a shelf right next to the stairs." The shotgun was discovered inside a cloth bag located on top of the basement television in a "makeshift bedroom," and the BB gun was on the couch.

Following a two-day bench trial, defendant was convicted and sentenced as provided earlier. Defendant subsequently filed a motion for dismissal, new trial, or evidentiary hearing contending that (1) he was denied his right to the effective assistance of counsel because his trial counsel failed to move to suppress evidence acquired during an unconstitutional search, (2) the photographs of the shelving unit containing the pistol, which were not presented to the trial court due to error on the part of either the prosecution or defense counsel, were exculpatory in nature, and the photographic evidence would have altered the outcome of the proceedings, and (3) MCL 750.224f was unconstitutional on its face and as applied to him in light of *New York State Rifle & Pistol Ass'n, Inc v Bruen*, 597 US 1; 142 S Ct 2111; 213 L Ed 2d 387 (2022). The trial court denied the motion, and this appeal ensued.

## II. ANALYSIS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

As explained below, because the record is insufficient to determine whether counsel was ineffective for failing to move to challenge the search and seizure of the firearms, we remand for the trial court to hold a *Ginther*[2] hearing.

In order to preserve an ineffective assistance of counsel argument for appellate review, a defendant must move for a new trial or request an evidentiary hearing in the trial court, *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012), or file with this Court a motion to remand for a *Ginther* hearing, *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Defendant preserved this issue for appeal by doing both. See *People v Hughes*, unpublished order of the Court of Appeals, entered December 26, 2024 (Docket No. 367172).

This Court reviews for an abuse of discretion a trial court's decision on a motion for a new trial. *People v Russell*, 297 Mich App 707, 715; 825 NW2d 623 (2012). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *Id*. "Generally, whether a defendant had the effective assistance of counsel is a mixed question of fact and constitutional law." *Heft*, 299 Mich App at 80 (quotation marks and citation omitted). "This Court reviews findings of fact for clear error and questions of law de novo." *Id*. Clear error exists if the

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

reviewing court "is left with a definite and firm conviction that the trial court made a mistake." *Abcumby-Blair*, 335 Mich App at 227-228 (quotation marks and citation omitted). Because defendant's motion to remand was denied, his argument is reviewed on the existing record. *Id*. at 227.

A defendant has the right to effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. To succeed on an ineffective-assistance-of-counsel argument, defendant must establish that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Id*. at 52. Though this strong presumption is a steadfast rule, we cannot "insulate the review of counsel's performance by calling it trial strategy." *Id*.

"The inquiry into whether counsel's performance was reasonable is an objective one and requires the reviewing court to determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012) (quotation marks and citation omitted). "This standard requires a reviewing court to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." *Id*. (quotation marks and citations omitted). This Court will not substitute its own judgment for that of counsel or use the benefit of hindsight in assessing defense counsel's competence. *People v Unger*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008). "The [e]ffective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Muniz*, 343 Mich App 437, 448; 997 NW2d 325 (2022) (quotation marks and citation omitted; alteration in original).

Because defendant did not challenge the search of the house in the trial court, defendant argues that his counsel's failure to do so was constitutionally ineffective. When trial counsel's failure to argue a Fourth Amendment violation is the basis of an ineffective-assistance-of-counsel claim, "the defendant must [] prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v Morrison*, 477 US 365, 375; 106 S Ct 2574; 91 L Ed 2d 305 (1986). On the other hand, if the Fourth Amendment argument lacked merit, counsel would not have been ineffective for failing to advocate a meritless position. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018) ("Counsel is not ineffective for failing to advance a meritless position or make a futile motion.") (quotation marks and citation omitted).

FOURTH AMENDMENT

The United States and Michigan Constitutions both guarantee a right to be free from unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11; *Herring v United States*, 555 US 135, 136; 129 S Ct 695; 172 L Ed 2d 496 (2009); *People v Slaughter*, 489 Mich 302, 310-311; 803 NW2d 171 (2011). "Michigan's constitutional prohibition against unreasonable searches and seizures is to be construed to provide the same protection as that secured by the Fourth Amendment of the United States Constitution, absent compelling reason to impose a

different interpretation." *People v Bolduc*, 263 Mich App 430, 437 n 9; 688 NW2d 316 (2004). "[A] search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *People v Taylor*, 253 Mich App 399, 404; 655 NW2d 291 (2002). "In general, searches conducted without both a warrant and probable cause to believe evidence of wrongdoing might be located at the place searched are unreasonable per se." *Lavigne v Forshee*, 307 Mich App 530, 537; 861 NW2d 635 (2014). Moreover, " 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *Arizona v Gant*, 556 US 332, 338; 129 S Ct 1710; 173 L Ed 2d 485 (2009), quoting *Katz v United States*, 389 US 347, 357; 88 S Ct 507; 19 L Ed 2d 576 (1967). "The exclusionary rule is a judicially created remedy that originated as a means to protect the Fourth Amendment right of citizens to be free from unreasonable searches and seizures." *People v Hawkins*, 468 Mich 488, 498; 668 NW2d 602 (2003). In general, this rule bars admission of evidence that was obtained during a constitutionally unreasonable search. *Id*. at 498-499.

The pertinent inquiry in this case is whether the search of the house by police was justified under a recognized exception to the warrant requirement, such that defense counsel's decision not to challenge the search and admission of related evidence was objectively reasonable. To that end, the prosecution argues that two exceptions to the warrant requirement apply: (1) police received consent to search, and (2) police were allowed to conduct a protective sweep of the house.[3] In the prosecution's view, because each of these exceptions apply, trial counsel was not ineffective for failing to move to suppress the guns seized during the search of the house.

## 1. CONSENT

"Consent searches, when voluntary, are an exception to the warrant requirement." *People v Frederick*, 500 Mich 228, 242; 895 NW2d 541 (2017). "The consent exception to the warrant requirement allows a search and seizure when consent is unequivocal, specific, and freely and intelligently given." *People v Frohriep*, 247 Mich App 692, 702; 637 NW2d 562 (2001) (quotation

---

[3] As a preliminary matter, the prosecution has not raised whether defendant had standing to challenge the warrantless search of the basement under the Fourth Amendment. See *Minnesota v Olson*, 495 US 91, 96-97; 110 S Ct 1684; 109 L Ed 2d 85 (1990) (providing an overnight guest in a home is entitled to protection from unreasonable searches under the Fourth Amendment); *People v Mahdi*, 317 Mich App 446, 460; 894 NW2d 732 (2016) (reasoning the "defendant had a legitimate expectation of privacy with regard to [his mother's apartment] that was objectively reasonable because he resided at the residence with his mother and had the ability to control the area searched and items seized"). At trial, the prosecution contended that defendant lived in the home, but, during opening statement, defense counsel argued that defendant "doesn't live there and he doesn't own the house." Later, defendant testified that he lived "[b]etween" his home and his mother's home, maintaining that he did not go down into the basement regularly. The trial court subsequently found that "[d]efendant admitted that he was living in the home where the firearms were recovered."

marks and citation omitted). "Whether consent to search is freely and voluntarily given presents a question of fact that must be determined on the basis of the totality of the circumstances; the presence of coercion or duress will militate against a finding of voluntariness." *Lavigne*, 307 Mich App at 538. Consent to search may also be limited in scope and revoked. *Frohriep*, 247 Mich App at 703. The standard to measure the scope of consent under the Fourth Amendment "is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange" between the officer and the person giving consent. *Florida v Jimeno*, 500 US 248, 251; 111 S Ct 1801; 114 L Ed 2d 297 (1991). "The scope of a search is generally defined by its expressed object." *Id*.

The record reflects that defendant's mother was the homeowner of the residence where the contested search was conducted. Pursuant to the officers' trial testimonies, after defendant was detained his mother informed law enforcement that defendant's grandmother was in the residence. Officer Bankstahl testified as to what was said in this exchange:

> We called [defendant] out of the house basically because we see him in a back room. We put handcuffs on [defendant] and then we put him inside of a patrol car. And then we make contact with the victims and ask them if there is anybody else inside. And she says yes, there is another female. We want her to come outside, you guys can go inside and check. That's what we do.

Based on this testimony, which is the only testimony addressing any consent for the officers to enter the house, it is debatable whether the "typical reasonable" person would have understood that defendant's mother consented to law enforcement entering the residence for the sole purpose of locating defendant's grandmother, or whether they received permission to search the entirety of the home to see whether "anybody else" was inside. See *People v Mead*, 503 Mich 205, 216; 931 NW2d 557 (2019) ("[T]he consenting party, either expressly or by implication, may place conditions upon the consent involving such matters as the time, duration, physical scope, or purpose of the search being consented to.") (quotation marks and citation omitted; alteration in original). On the one hand, the brief exchange between the mother and police can be read to have granted permission to only locate the grandmother, meaning that while officers were authorized to enter the home in order to locate defendant's grandmother, a reasonable person would have understood that once the person in question was located, searching the residence further exceeded the scope of consent given by defendant's mother. See *People v Mahdi*, 317 Mich App 446, 461-462; 894 NW2d 732 (2016) (opining mother's consent "to search her apartment for the limited purpose of uncovering illegal drugs did not constitute consent to seize *any* item. The seizure of [her son's] wallet, keys, and cell phone, therefore, fell outside the scope of [mother's] consent"). On the other hand, because police asked whether anyone else was inside the home, and the mother told them that the grandmother was and they could check, a reasonable person could also conclude that the consent was to search the entire residence to determine whether anyone else was inside, not just the mother. The trial court recognized this testimony, but never made a finding as to the extent of any permission granted by the mother. And, again, this is based solely on the limited trial testimony.

## 2. PROTECTIVE SWEEP

Another recognized exception proffered by the prosecution is the protective sweep exception to the warrant requirement, which allows police to perform a quick and limited sweep of the area immediately adjacent to where a suspect is arrested because of the inherent "risk of danger to the police or others inside or outside a dwelling." *People v Henry (After Remand)*, 305 Mich App 127, 138; 854 NW2d 114 (2014). A protective sweep can be justified when police have an interest "in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Maryland v Buie*, 494 US 325, 333; 110 S Ct 1093; 108 L Ed 2d 276 (1990). See also *People v Cartwright*, 454 Mich 550, 556-557; 563 NW2d 208 (1997). There are two types or forms of protective sweeps. *United States v Colbert*, 76 F3d 773, 776 (CA 6, 1996). The first requires no probable cause or reasonable suspicion, and allows officers as a precautionary matter to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 US at 334. A more expansive sweep that goes beyond areas immediately adjacent to where the arrest took place requires more, i.e., that officers have some articulable facts "which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. See also *United States v Everett*, 91 F4th 698, 709-710 (CA 4, 2024).

The record from trial does not support the officers' action of making a protective sweep of the entire house. Because this sweep was not limited to the area immediately adjoining the area where defendant was apprehended, the officers must have relied upon some articulable facts that would cause a reasonable officer to suspect that a dangerous person(s) may be on scene, to warrant a more expansive (yet still limited) sweep.[4] But they did not. There is no dispute that defendant was detained prior to law enforcement's search of the basement, and there was no indication of any risk to persons located inside or outside the premises, after the recovery of defendant's grandmother, to warrant further entry. After all, the officers jointly testified that they arrived on the premises looking for an armed man, and immediately apprehended defendant, confirming that he was the alleged perpetrator and the only man in the residence. Although officers properly entered the home to locate defendant's grandmother, they continued to search the remainder of the residence, including the basement where the firearms were recovered, despite the fact there was no indication of any continuing danger inside the home or any other "articulable facts" substantiating the need to enter the basement or other parts of the home that were not immediately adjoining where defendant was apprehended.

In other words, before engaging in the extended sweep all occupants of the home, including defendant, were accounted for by law enforcement and there was no evidence that anyone else was present in the home, or that officers disbelieved the women that no one else was in the house. Nor

---

[4] That a defendant is immediately outside a house does not preclude officers from engaging in a protective sweep inside the house, assuming any other requirements are satisfied. See, e.g., *Colbert*, 76 F3d at 776, and *United States v Waters*, 883 F3d 1022, 1026 (CA 8, 2018).

were officers dealing with an alleged crime like drug dealing that often might involve other people. Further, there was no articulated concern for possible victims inside the home. And, "a lack of information cannot provide an articulable basis upon which to justify a protective sweep." *United States v Jones*, 667 F3d 477, 484 (CA 4, 2012) (quotation marks, citation, and alteration omitted). Under these facts, a warrantless protective sweep of the basement was not supported by existing case law. See *People v Hughes (On Remand)*, 339 Mich App 99, 109; 981 NW2d 182 (2021) ("Because there was existing precedent that would have strongly supported a motion to suppress, trial counsel's failure to raise the Fourth Amendment challenge cannot be excused . . . .").

The trial court and the prosecution viewed *People v Beuschlein*, 245 Mich App 744, 750; 630 NW2d 921 (2001), as controlling. Although *Beuschlein* recognized that "[t]he Fourth Amendment permits a properly limited protective sweep in connection with an in-home arrest if the police reasonably believe that the area in question harbors an individual who poses a danger to them or to others," *Beuschlein*, 245 Mich App at 757, there are important factual distinctions between the circumstances facing police in *Beuschlein* and those here. In *Beuschlein*, law enforcement "was dispatched in response to an 'open 9-1-1 call,' in which the caller failed to hang up. According to the dispatch, there was a domestic incident in progress, possibly involving guns and knives." *Id.*, at 747. When the officer arrived on the premises, he knocked on the door, received no answer, and he could hear " 'wrestling or moving around, a lot of shuffling around' inside the house." *Id*. The officer was unaware of the number of persons inside the residence, and he testified that "he handcuffed defendant 'for our safety and everybody's safety in the home,' because at that point he still did not know how many people were in the house." *Id*. There were no intervening circumstances between the dropped 911 call and law enforcement's entry into the home that dissipated the perceived exigency; in fact, the sounds of wrestling and scuffling exacerbated the exigency, validating the officers' entry into the home.

To the contrary, here, law enforcement detained defendant, communicated with defendant's mother and defendant's girlfriend to discern what transpired, confirmed the number of persons present on the premises, and located defendant's grandmother, all prior to conducting the search of the basement. Furthermore, officers were aware of defendant's identity as the alleged perpetrator. Additionally, none of the officers testified that they entered the residence, or continued their search therein, for the purpose of addressing potential dangers inside the home, or retrieving other perpetrators. *Beuschlein*, therefore, is a good example of when a protective sweep is constitutionally permissible: when officers are addressing an unknown situation inside a house with no knowledge of how many people are inside, or if they are armed. Those important facts are absent from this record.

Although the protective sweep exception to the search warrant requirement did not permit the police to search, the consent exception may or may not have. Therefore, we must remand to the trial court to hold a *Ginther* hearing to determine whether defense counsel was ineffective for failing to move to suppress the firearms seized from the basement based upon consent.[5]

---

[5] Defendant contends that his counsel's performance was also deficient because she did not call any defense witnesses, particularly defendant's mother and his girlfriend, but he does not provide

## B. OMISSION OF POLICE PHOTOGRAPHS

Defendant argues that the prosecution's failure to disclose photographic evidence constituted a constitutional violation under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). Defendant alternatively argues that if the contested evidence was provided to defense counsel, defendant was deprived of the effective assistance of counsel as it was unreasonable for trial counsel to omit photographic evidence that disproved defendant's constructive possession of the firearm. The record is unclear on whether defense counsel was provided the photographs, either electronically or otherwise. On remand the parties and the court should address these issues as well.[6]

## C. MCL 750.224f

For his final argument, defendant asserts that Michigan's felon-in-possession statute, MCL 750.224f, is unconstitutional on its face and as applied to him. Because a ruling in defendant's favor would preclude a new trial on this charge, we must address the issue in the event a new trial is granted on remand.

"Whether a statute is constitutional is a question of law that this Court reviews de novo." *People v Boomer*, 250 Mich App 534, 538; 655 NW2d 255 (2002). "Statutes are presumed to be constitutional, and the party challenging a statute has the burden of showing the contrary." *People v Burkman*, 513 Mich 300, 326; 15 NW3d 216 (2024). "A facial challenge alleges that a statute is unconstitutional 'on its face,' meaning that, in general, 'the challenger must establish that no set of circumstances exists under which the [statute] would be valid.' " *Id*. at 326, quoting *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987) (alteration in original). An as-applied challenge "alleges a present infringement or denial of a specific right or of a particular injury in process of actual execution of government action." *Burkman*, 513 Mich at 327 (quotation marks and citation omitted).

---

any proof that they would have provided favorable testimony. Stated alternatively, defendant failed to sustain his burden of alleging facts indicating his counsel's failure to obtain these witnesses was objectively unreasonable, particularly as the two were the complainants in the underlying matter. See *People v Solloway*, 316 Mich App 174, 189; 891 NW2d 255 (2016). Furthermore, without any offer of proof disclosing the nature of the missing testimonies, defendant cannot establish there was a reasonable probability that the outcome of his trial would have differed if those witnesses testified. *People v Haynes*, 338 Mich App 392, 430; 980 NW2d 66 (2021). Defendant was not denied the effective assistance of counsel when his counsel failed to call these two witnesses.

[6] The Department of Corrections website indicates that defendant was discharged in April of this year after serving his sentence. Thus, we recognize that whether proceedings on remand take place will depend on whether the prosecutor deems it worthy to go forward.

"Both the United States Constitution and the Michigan Constitution grant individuals a right to keep and bear arms for self-defense." *People v Deroche*, 299 Mich App 301, 305; 829 NW2d 891 (2013) (quotation marks and citation omitted). The Second Amendment of the United States Constitution provides, "A well[-]regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." US Const, Am II. The Michigan Constitution further states, "Every person has a right to keep and bear arms for the defense of himself and the state." Const 1963, art 1, § 6. "Like most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v Heller*, 554 US 570, 626; 128 S Ct 2783; 171 L Ed 2d 637 (2008). Under Michigan law, persons convicted of certain felonies, like defendant, "shall not possess, use, transport, sell, purchase, carry, ship, receive, or distribute a firearm" until the expiration of a specified time period and the fulfillment of particular conditions. MCL 750.224f(1) and (2).[7]

## 1. FACIAL CHALLENGE

Defendant first contends that a conviction under MCL 750.224f results in an unconstitutional restriction of Second Amendment rights, as a felony conviction does not forfeit a person's right to "keep and bear" arms, which "belong[s] to all Americans." However, as defendant recognizes, we have repeatedly rejected this argument. See *People v Powell*, 303 Mich App 271, 273; 842 NW2d 538 (2013) ("Exceptions to the right to bear arms include regulation of gun possession by felons"). In *Deroche*, for example, this Court opined that barring firearm possession by certain "classes of persons" did not violate the Second Amendment as "the categories of presumptively lawful regulatory measures" included "restrictions preventing felons, the mentally ill, or illegal drug users from possessing firearms because they are viewed as at-risk people in society who should not bear arms." *Deroche*, 299 Mich App at 307-308.

Similarly, in *People v Green*, 228 Mich App 684, 692; 580 NW2d 444 (1998), we held that the defendant's "right to bear arms under the Michigan Constitution was not violated by the felon-in-possession charge[,]" as "[a] person's right to bear arms under Const 1963, art 1, § 6 is not absolute and is subject to the reasonable limitations set forth in MCL 750.224f . . . ." And, in *People v Swint*, 225 Mich App 353, 362-363; 572 NW2d 666 (1997), this Court determined that the constitutional protection of the right to bear arms provided in the Michigan Constitution "does not guarantee defendant the right to possess a firearm after defendant is convicted of a felony" and that MCL 750.224f "represents a reasonable regulation by the state in the exercise of its police power to protect the health, safety, and welfare of Michigan citizens."

Despite these decisions, defendant argues that the constitutionality of MCL 750.224f must be reevaluated in light of the *Bruen* framework concerning the regulation of firearms. The *Bruen* Court held that:

---

[7] Defendant was prohibited from possessing a firearm under MCL 750.224f because he was previously convicted of carrying a concealed weapon (CCW), MCL 750.227, in 1994, which is a "specified felony" under the statute.

when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command. [*Bruen*, 597 US at 17 (quotation marks and citation omitted).]

According to defendant, the nuanced historical analysis required by *Bruen* changes the conclusions in cases like *Swint*, *Green*, and *DeRoche*. We conclude otherwise, as have the vast majority of federal circuit courts of appeal that have addressed this issue under the federal felon-in-possession statute.

In rejecting defendant's argument, we emphasize that both before and after *Bruen*, the Court and individual justices have emphasized that the Court's recent Second Amendment jurisprudence has not placed into question statutes like those prohibiting gun possession by felons. Indeed, the *Heller* Court emphasized, following a comprehensive examination of the language and history of the Second Amendment, that:

Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [*Heller*, 554 US at 626-627.]

*McDonald v Chicago*, 561 US 742, 786; 130 S Ct 3020; 177 L Ed 2d 894 (2010), came after *Heller*, and while holding that the Second Amendment's guarantee of the right to bear arms applies to the states through the Fourteenth Amendment, again recognized that the "longstanding regulatory measures" like those barring persons convicted of felonies from possessing firearms remain permissible.

Moreover, in *Bruen*, Justices Kavanaugh and Breyer reiterated that the right to bear arms was not infinite, with both highlighting the *Heller* opinion concerning the firearm restrictions on persons convicted of felonies. *Bruen*, 597 US at 81 (KAVANAUGH, J., concurring) and at 129-130 (BREYER, J., dissenting). Justice Alito also clarified in a concurring opinion that:

Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald v Chicago*, 561 US 742, 130 S Ct 3020, 177 L Ed 2d 894 (2010), about restrictions that may be imposed on the possession or carrying of guns. [*Id*. at 72 (ALITO, J., concurring).]

Likewise, the *Rahimi* Court opined that felon-in-possession statutes are "presumptively lawful." *United States v Rahimi*, 602 US 680, 699; 144 S Ct 1889; 219 L Ed 2d 351 (2024), citing

*Heller*, 554 US at 626, 627 n 26. The *Rahimi* Court examined the constitutionality of a federal statute which prohibited persons from possessing a firearm if his or her restraining order included a finding that the person posed "a credible threat to the physical safety" of a protected person, or if the restraining order "prohibits the use, attempted use, or threatened use of physical force." *Rahimi*, 602 US at 693 (quotation marks and citations omitted). The Court advanced that the regulation at issue, unlike the statute in *Bruen*, encumbered a person's Second Amendment right only after a court determined the individual posed a legitimate threat to the physical safety of others. *Id*. at 697-699. Furthermore, *Rahimi* acknowledged that comparable restrictions were prevalent throughout the nation's tradition of firearm regulation by means of surety and "going armed" laws, which involved judicial determinations of whether a particular defendant would likely threaten or had threatened another with a weapon. *Id*. at 699. Ultimately, *Rahimi* held that the federal felon-in-possession statute was constitutional because "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id*. at 702.

Despite this repeated (and significant) dicta from the Supreme Court and individual justices, defendant argues that *Bruen* changed the landscape and now felon-in-possession statutes are invalid. In doing so, defendant cites to *Range v Attorney General*, 69 F4th 96 (CA 3, 2023), vacated by *Garland v Range*, ___ US ___; 144 S Ct 2706; 219 L Ed 2d 1313 (2024), and on remand, *Range v Attorney General*, 124 F4th 218 (CA 3, 2024), as an instance where a court vacated a felon-in-possession conviction under the Second Amendment, in light of *Bruen*. We are not persuaded by *Range*. First, *Range* appears inconsistent with *Heller*, *McDonald*, and *Rahimi*. As we have just recounted, in each of those decisions either the Court, or individual justices, or both, emphasized (and re-emphasized) the continuing constitutional validity of felon-in-possession type statutes. Although much of that was dicta, the signaling those statements provide are worthy of serious consideration. As the Second Circuit stated less than a month ago in *Zherka v Bondi*, 140 F4th 68, 75 (CA 2, 2025):

> Other Circuit Courts have also held that neither *Bruen* nor *Rahimi* abrogated their prior precedent holding Section 922(g)(1) facially constitutional on the basis of the continued vitality of *Heller* and *McDonald*'s assurances. See *United States v Duarte*, 137 F4th 743, 749-753 (CA 9, 2025) (en banc); *Vincent v Bondi*, 127 F4th 1263, 1264-1266 (CA 10, 2025); *United States v Hunt*, 123 F4th 697, 703-704 (CA 4, 2024); *United States v Hester*, No. 23-11938, 2024 WL 4100901, at *1 (CA 11, 2024) (unpublished).

Accord: *United States v Langston*, 110 F4th 408, 419-420 (CA 1, 2024); *United States v Diaz*, 116 F4th 458, 468-469, 472 (CA 5, 2024) ("The government has met its burden to show that applying 18 USC 922(g)(1) to Diaz is consistent with this Nation's historical tradition of firearm regulation. At the time of the Second Amendment's ratification, those—like Diaz—guilty of certain crimes—like theft—were punished permanently and severely. And permanent disarmament was a part of our country's arsenal of available punishments at that time. Because applying § 922(g)(1) to Diaz 'fits neatly' in this tradition, it is constitutional as applied and facially as well.") (citation omitted); *United States v Williams*, 113 F4th 637, 662-663 (CA 6, 2024) ("To summarize, we hold today that § 922(g)(1) is constitutional on its face and as applied to dangerous people. Our nation's historical tradition confirms *Heller*'s assumption that felon-in-possession laws are 'presumptively lawful.' "); *United States v Gay*, 98 F4th 843, 846 (CA 7, 2024) (recognizing circuit disagreement

with the *Range* court's conclusions); *United States v Jackson*, 110 F4th 1120, 1127 (CA 8, 2024) (upholding § 922(g)(1) as valid under *Bruen* because the defendant was "not a law-abiding citizen, and history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society"); *Fooks v State*, 490 Md 458, 493; 337 A3d 83 (2025).

Second, when using the *Bruen* analysis, it is evident that MCL 750.224f "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 US at 24. The Second Amendment protects rights of "law-abiding citizens," while permitting federal and state governments to disarm certain classes of individuals without violating the Second Amendment. See *Rahimi*, 602 US at 698 ("Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed.").

Federal courts since *Bruen* have determined that, consistent with analogous colonial era laws, states can, in accordance with the Second Amendment, enact laws restricting the possession of firearms by felons. See *Diaz*, 116 F4th at 470 (opining that "the 'public understanding' of the Second Amendment around the time of its ratification" indicated that "the right to bear arms at the time was not unlimited, and that the government could prevent people who had committed crimes or were 'quarrelsome' from accessing weapons"); *Jackson*, 110 F4th at 1127 ("[Defendant] is not a law-abiding citizen, and history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society."); *United States v Yancey*, 621 F3d 681, 684-685 (CA 7, 2010) ("most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens[,]' " such as persons convicted of felonies) (citation omitted).

One court set out a detailed history of colonial era laws that show, consistent with *Bruen*, historical analogues to felon-in-possession laws. We borrow that court's work as our own:

> The court looks to historical sources from the American Colonies and early Republic. Some American Colonies initially adopted the concept of attainder, which could result in the forfeiture of property and loss of civil rights. Bills of attainder were specifically applied to disarm the "disaffected" and "delinquents"—that is, Tories and those not associated with either side.
>
> "[I]n classical republican political philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the 'virtuous citizen.' " In colonial New York, the "disaffected" were "guilty of a breach of the General Association" and outside of protection of "all the blessings resulting from that liberty which they in the day of trial had abandoned, and in defence of which many of their *more virtuous* neighbors and countrymen had nobly died." Thus, colonial bills of attainder indicate that "the founders conceived of the right to bear arms as belonging only to virtuous citizens."
>
> Although not "historical twins" to § 922(g)(1), the attainder statutes are sufficient "historical analogues" as they reflect regulations designed to protect the

-12-

virtuous citizenry—the "why"—through disarmament of the less virtuous—the "how."

Additionally, in the province of New York, persons convicted of a felony could not own property or chattels. Because felons were broadly precluded from possessing property, it is implicit that they could not possess a firearm.

After independence, the Bill of Rights, including the Second Amendment, was adopted in 1791. Prior to its adoption, however, three proposals were made during the states' constitutional ratification conventions that provide insight into historical firearm restrictions on felons.

First, the Pennsylvania Anti-Federalists, who were in the minority of their state, proposed a constitutional amendment providing "[t]hat the people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game" and that "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." Justice Scalia referred to the minority Pennsylvania proposal as "highly influential," likely because "it represents the view of the Anti-federalists—the folk advocating for very limited federal power, opposing the Constitution generally, but advocating for a strong Bill of Rights." "Even these advocates of broad individual and state rights viewed the right to possess and carry arms as limited—particularly from those who had committed crimes or were a danger to the public."

Second, Samuel Adams proposed a similar amendment to the Massachusetts ratifying convention "that would have precluded the Constitution from ever being 'construed' to 'prevent the people of the United States, who are peaceable citizens, from keeping their own arms." Although the proposed amendment was ultimately rejected, it too reflects the view that the state possessed the right to prohibit those who had committed prior bad acts from keeping a firearm.

Third, during the New Hampshire constitutional convention, delegates voted to recommend a proposed amendment providing that "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion."

Construed together, these proposals indicate that "the Founders [did not] consider[ ] felons within the common law right to arms or intend[ ] to confer any such right upon them." " '[C]rimes committed'—violent or not—were thus an independent ground for exclusion from the right to keep and bear arms."

It has been suggested that the aforementioned proposals are not persuasive because they failed. However, the failure of the proposed amendments was not because early Americans objected to the limitations on the right to bear arms included therein. Rather, the failure of the proposed amendments is properly attributed to a lack of support by Federalists, who were in the majority in some early ratifying states, for inclusion of a bill of rights as a whole. Ultimately,

inclusion of the Bill of Rights won the day. Likewise, although some scholars have pointed out that the Second Amendment as ratified did not explicitly limit the right to virtuous or peaceable persons or exclude felons, other scholars have suggested that no objection was made because the exclusions were understood. Thus, the three proposals made during the states' constitutional ratification conventions are persuasive historical evidence.

Other historical evidence from the period indicates that regulations prohibiting firearms to those convicted of crimes were consistent with the understanding of the early Americans who adopted the Constitution. The Virginia Constitution of 1776 proposed by Thomas Jefferson provided "[n]o *freeman* shall ever be debarred the use of arms." At the time, "freeman" referred to persons who enjoyed particular liberties or privileges. The draft Virginia Constitution provides a relevant historical analogue, as it contemplates that those who had been subject to revocation of certain societal privileges, including disenfranchisement, should be excluded from the right to bear arms. Further, Jefferson's proposal bears upon the court's interpretation of post-enactment historical evidence. [*United States v Coombes*, 629 F Supp 3d 1149, 1157-1160 (ND Okla, 2022) (citations omitted; alterations in original).]

Under these persuasive decisions, MCL 750.224f is not facially invalid under the Second Amendment. MCL 750.224f imposes limitations on the right to possess firearms and ammunition. At the time of defendant's offense and conviction for felon-in-possession, the statute barred firearm and ammunition possession for persons convicted of violations of state or federal law punishable by imprisonment of four years or more, MCL 750.224f(9)(b), and persons convicted of a "specified felony," MCL 750.224f(10). MCL 750.224f, as amended by 2023 PA 201.[8] Accordingly, MCL 750.224f's restrictions are consistent with the Nation's historical precedent of regulating firearm possession by persons convicted of felonies, and defendant's facial challenge regarding the constitutionality of the felon-in-possession statute fails.

2. AS-APPLIED CHALLENGE

We likewise reject defendant's as-applied challenge to MCL 750.224f. States maintain an interest in addressing gun violence and are permitted to employ regulations to address the matter within the confines of the Second Amendment. See *Rahimi*, 602 US at 698 (providing that a federal "prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent"). The purpose of Michigan's felon-in-possession statute is "to ensure that those persons who are more likely to

---

[8] We note that the statute currently prohibits firearm and ammunition possession for persons convicted of violations of state or federal law punishable by imprisonment of one year or more, MCL 750.224f(10)(b), persons convicted of a misdemeanor involving domestic violence, MCL 750.224f(5), and persons convicted of a "specified felony," MCL 750.224f(10)(d). However, the definition of a "specified felony" remains fundamentally unchanged. MCL 750.224f(10)(d).

-14-

misuse firearms do not maintain ready possession of them." *People v Dupree*, 284 Mich App 89, 106; 771 NW2d 470 (2009), aff'd 486 Mich 693 (2010). In instituting MCL 750.224f, the Legislature determined that persons convicted of felonies, "who have exhibited their disregard for ordered society and pose a threat to public safety," should not possess firearms for at least "three to five years after a felon successfully completes his term of incarceration and probation and pays all requisite fines." *Swint*, 225 Mich App at 374.

Contrary to defendant's contention, Michigan's felon-in-possession statute is not unconstitutional as applied to him considering his status as a nonviolent offender. Despite defendant's contentions, there is historical precedent barring nonviolent offenders from exercising their Second Amendment rights. See *Hunt*, 123 F4th at 706 (stating, "Colonial-era offenders who committed non-violent hunting offenses were ordered to forfeit their firearms[,]" and "English and colonial American governments also enacted other types of categorical bans on the possession of firearms by those who refused to follow less formal legal norms"); *Jackson*, 110 F4th at 1129 (concluding "that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons," which included defendant, who was previously convicted of drug offenses).

The "historical record suggests that legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a danger of misuse by those who deviated from legal norms, not merely to address a person's demonstrated propensity for violence." *Jackson*, 110 F4th at 1127. This conclusion is "bolstered by the Supreme Court's repeated statements in *Bruen* that the Second Amendment protects the right of a 'law-abiding citizen' to keep and bear arms." *Id.* As further articulated in *Yancey*:

> As we've explained in a different context, most felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use. *United States v Lane*, 252 F3d 905, 906 (CA 7, 2001). Thus, while felon-in-possession laws could be criticized as "wildly overinclusive" for encompassing nonviolent offenders, every state court in the modern era to consider the propriety of disarming felons under analogous state constitutional provisions has concluded that step to be permissible. [*Yancey*, 621 F3d at 685.]

Other federal courts have reached similar conclusions regarding whether the nonviolent nature of a defendant's prior felony conviction renders restrictions of his Second Amendment rights unconstitutional. See *Bondi*, 127 F4th at 1266 (holding the Second Amendment does not prevent the application of the federal felon-in-possession statute to nonviolent offenders); *Hunt*, 123 F4th at 707 (stating, "Just as early legislatures retained the discretion to disarm categories of people because they refused to adhere to legal norms in the pre-colonial and colonial era, today's legislatures may disarm people who have been convicted of conduct the legislature considers serious enough to render it a felony.").

In crafting MCL 750.224f, the Legislature expressly defined the term felony to include only serious violations of law, indicating that the Legislature implicitly acknowledged that persons

-15-

convicted of certain offenses are more likely to unlawfully use firearms. See *Swint*, 225 Mich App at 374-375 (stating that MCL 750.224f "has effectively achieved the legitimate legislative purpose of keeping guns out of the hands of those most likely to use them against the public"). Furthermore, the Legislature did not permanently prohibit persons convicted of specified felonies, like defendant, from possessing firearms and ammunition; rather, MCL 750.224f(2) permits such persons to do so after five years if they have paid all associated fines, served the terms of their incarceration, and complied with the terms of their parole or probation. MCL 750.224f(2). Thus, while defendant contends the dated nature of his felony conviction further establishes that MCL 750.224f was unconstitutional as applied to him, the record does not indicate, nor does defendant contend on appeal, that he previously attempted to restore his Second Amendment rights, despite being eligible to do so under the statute.

Nor does the fact that defendant was convicted under a constructive possession theory change our conclusion. Our Nation's courts have long analyzed the constitutionality of felon-in-possession statutes without distinguishing between whether the defendant was convicted under a theory of actual or constructive possession; instead the relevant inquiry was whether the defendant's felony conviction properly barred him from possessing firearms. See *United States v Mull*, 113 F4th 864, 869-870 (CA 8, 2024) (opining that the defendant's felon-in-possession convictions did not violate his Second Amendment rights, when defendant was convicted under a constructive possession theory); *United States v Rogers*, 41 F3d 25, 29 (CA 1, 1994) (providing constructive possession of a firearm, for purposes of the felon-in-possession statute, is not a separate predicate act that must be spelled out in an indictment, as "[c]onstructive possession . . . *is* possession"). Consequently, as applied to him, defendant's conviction under MCL 750.224f did not violate his Second Amendment right.

Remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Anica Letica
/s/ Sima G. Patel